NOT FOR PUBLICATION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

ALBERT W. FLORENCE,     :
           :
      Plaintiff,     :     Hon. Joseph H. Rodriguez
           :
     v.         :     Civil Action No. 05-3619
           :
BOARD OF CHOSEN     :     **OPINION & ORDER**
FREEHOLDERS OF THE     :
COUNTY OF BURLINGTON,     :
et al.,           :
           :
      Defendants.     :

**RODRIGUEZ**, Senior District Judge:

Plaintiff Albert Florence ("Florence" or "Plaintiff") initiated this action primarily

to seek redress for allegedly being subjected to two unlawful strip searches while in the

custody of the Burlington County Jail ("Burlington Jail") and the Essex County

Correctional Facility ("Essex Jail"). To this end, he filed a Complaint in which he named

as Defendants: (1) the Board of Chosen Freeholders of Burlington County, the Burlington

Jail, its warden, and several John Doe Burlington Jail officers (collectively "Burlington

County Defendants"); and (2) the Essex Jail, the Essex County Sheriff's Department, and

several John Doe Essex Jail officers (collectively "Essex County Defendants"). After

receiving leave of the Court, Florence filed an Amended Complaint in which he added

class action allegations relating to what he claims is Defendants' "policy and practice of

subjecting arrestees to blanket strip searches without any individualized finding of

reasonable suspicion, or probable cause . . . ."  (Am. Compl., ¶ 42.)  Presently before the

Court is Plaintiff's motion pursuant to Rule 23 of the Federal Rules of Civil Procedure for

certification of his proposed class [73].  For the reasons that follow, the Court will grant

the motion.

## I.  BACKGROUND

### A.  Facts Relating to Plaintiff's Arrest,
### Detention, and Alleged Strip Searches

On March 3, 2005, Plaintiff was a passenger in his sport utility vehicle, which was

being driven by his wife on Interstate Highway 295 in Burlington County.  (Am. Compl.,

¶¶ 13-14.)  The vehicle was stopped by a New Jersey State Trooper, who directed

Florence to exit the passenger compartment and arrested him based on an Essex County

bench warrant that was issued on April 25, 2003.  (Pl. Br., p. 1.)  Plaintiff contends that

this warrant charged him with a form of civil contempt that is not an indictable offense.[1]

(Id., p. 2.)  In fact, the warrant related to a fine which Plaintiff had already paid.  (Id., p.

2.)  Although Florence protested the warrant's validity, he was taken by the State Trooper

to the Burlington Jail.  (Am. Compl., ¶¶ 15, 17.)

Once at the Burlington Jail, Plaintiff was subjected to what he alleges was a full

strip and body cavity search.[2]  (Id., ¶ 17.)  According to Florence's deposition testimony,

---

[1]The nature of the offense with which Plaintiff was charged is a critical issue at this stage
of the litigation and will be discussed in detail in section II.A.3, infra, of this Opinion & Order.

[2]Although it is not binding on this Court for the purpose of determining the
constitutionality of an alleged strip search, it is instructive to note that New Jersey law defines a

an officer directed him to remove all his clothing and, while nude, he was told to open his mouth, lift his tongue, hold his arms out, turn fully around, and lift his genitals. (Pl. Exh. D, 70:23-71:9.) Plaintiff complied with these requests while the officer sat about an arm's length in front of him. (Id., 213:16-18.) The officer then instructed Florence to shower. (Id., 72:4.) Thereafter, Plaintiff was held at the Burlington Jail for six days. (Am. Compl., ¶ 17.)

After the sixth day, the Essex County Sheriff's Department collected Plaintiff and transported him to the Essex Jail. (Id., ¶ 26.) Upon his arrival there, Florence was processed and again subjected to what he alleges was a full strip and body cavity search. (Id.) According to Plaintiff's deposition testimony, Essex Jail officers told him and four other arrestees to enter separate shower stalls, strip off all their clothing, and shower. (Pl. Exh. D, 128:8-12.) Plaintiff and the other arrestees complied by removing their clothes while two officers watched. (Id., 215:22-216:11.) Plaintiff then showered, during which he was directed to open his mouth and lift his genitals. (Id., 128:23-129:9.) He was then ordered to turn around so that he faced away from the officers, after which he was told to squat and cough, and then to turn back around to face front. (Id., 129:9-15.) Following this episode, Florence was placed with the general jail population until the next day when the charges against him were dismissed. (Am. Compl., ¶ 29.)

_____

strip search as "the removal or rearrangement of clothing for the purpose of visual inspection of the person's undergarments, buttocks, anus, genitals or breasts." N.J. STAT. ANN. § 2A:161A-3.

B.  Evidence in the Record

Plaintiff attached to his moving papers several documents and deposition transcripts relating to Defendants' intake policies and procedures.  The Court will briefly summarize some of this evidence as it relates directly to Plaintiff's class action allegations.

1.  Burlington Jail's Procedures

The Burlington Jail's inmate searching procedures are based on a document entitled "Policies and Procedures: Search of Inmates – No. Section 1186" (hereinafter "Section 1186").  (See Pl. Exh. L.)  Section 1186 defines a strip search as "a physical search of an inmate . . . while unclothed consisting of routine and systematic visual observation of the inmate's physical body to look for distinguished identifying marks, scars or deformities, signs of illness, injury or disease and/or the concealment of contraband on the inmate's body."  (Id., p. 1.)  The document also provides that "[a] person who has been detained or arrested for commission of an offense other than a crime[3] . . . shall not be subject to a strip-search unless there is a reasonable suspicion that a weapon, controlled dangerous substance or contraband will be found."  (Id., p. 2.)

Several Burlington Jail officers and its warden testified in depositions about these procedures.  Lieutenant Douglas Chilton has worked for the Burlington Jail since 1997.  He executed a document related to Plaintiff's alleged strip search entitled "Strip Search

---

[3]Under New Jersey law, offenses other than crimes do not require indictment by a grand jury.  See N.J. STAT. ANN. § 2C:1-4(b).  In other words, such offenses are "non-indictable."

4

Authorization Form."  (See Pl. Exh. N.)  This form indicates that Plaintiff was not strip

searched.  (Id.)  During Lieutenant Chilton's deposition, he explained that arrestees who

are brought in for non-indictable offenses are subjected to a "visual observation," while

those admitted for indictable offenses are strip searched.  (Pl. Exh. J, 12:3-5.)  He further

explained that Florence's Strip Search Authorization Form was marked "not strip

searched" because he was admitted for a "failure to appear," which is a non-indictable

offense, and which mandates only a visual observation during intake.  (Id., 24:15-25:2.)

　　　　Officer Haywood Reeder has worked at the Burlington Jail since 1990.  He, too,

confirmed that arrestees admitted for non-indictable offenses, such as civil contempt,

should not be strip searched.  (Pl. Exh. F, 13:8; 13:18-14:2.)  Relatedly, he defined a strip

search as searching various parts of a nude inmate's body for contraband, scars, marks, or

tattoos.  (Id., 14:3-10, 19:6-9.)  By contrast, all inmates, irrespective of whether they are

indictable or non-indictable, are subjected to a visual observation.  (Id., 17:14-19, 27:1-7.)

According to Officer Reeder, a visual observation includes checking a nude arrestee for

scars, marks, and tattoos while he strips for a mandatory shower, instructing the nude

arrestee on the application of a delousing agent, then instructing the nude arrestee to

change into jail clothing following his shower.  (Id., 14:20-15:10, 16:10-18:22, 23:7-10,

26:16-20.)

　　　　Officer Charles Palmer has worked for the Burlington Jail since 2000.  He also

explained that arrestees admitted for non-indictable offenses are subjected to a visual

observation.  (Pl. Exh. G, 5:24-6:7.)  Officer Palmer further testified that a visual observation involves taking an inmate into the shower area, having them remove all their clothing, directing them to turn around while nude so the officer can look for bruises and distinguishing marks, and then having the inmate take a shower.  (Id., 6:10-18, 8:8-14, 9:14-10:24, 12:24-13:12.)  According to Officer Palmer, the difference between a visual observation and a strip search is that, with the latter, officers direct arrestees to spread their buttocks and/or lift their genitals.  (Id., 23:8-14.)  However, he also acknowledged that he has found genital piercings and tattoos during visual observations, (id., 13:13-20,) which suggests there is at least some examination of the genitals during a visual observation.

Officer Sean Gallagher has worked for the Burlington Jail since 1996.  He, like the other officers, testified that non-indictable arrestees, such as those arrested for civil contempt, are subjected to a visual observation.  (Pl. Exh. H, 19:22; 19:25-20:7.)  Moreover, he explained that a visual observation entails taking the arrestee to a shower room, having him remove his clothing and turn around while the officer looks at the arrestee's nude body to check for scars, marks, tattoos, and body vermin, before finally instructing the arrestee to shower with a delousing agent.  (Id., 11:9-15, 12:3-18, 13:4-24, 19:22-24, 32:24-33:5, 54:4-12.)  During these visual observations, Officer Gallagher directs inmates with hanging genitalia to lift their genitals in order to look for contraband, scars, marks, and tattoos.  (Id., 15:14-25.)  When asked how this differed from a strip

search, Officer Gallagher explained that strip searches are "a little more thorough," and involve having the inmate bend over and spread his buttocks so the officer can "get a view of their anus to see if there is anything that would be suspicious looking . . . ."  (Id., 18:22-19:3.)  In any event, Officer Gallagher acknowledged that all arrestees, whether indictable or non-indictable, are required to take off their clothing while the officer visually observes them and has them turn around.  (Id., 54:4-12.)  According to Officer Gallagher, this is required by the Burlington Jail's custom and practice, which every corrections officer follows.  (Id., 54:13-25.)

Lieutenant Jerry Coleman has worked at the Burlington Jail since 1990.  He explained that arrestees who are not indictable are subjected to a visual observation as part of the intake process.  (Pl. Exh. I, 11:12-14.)  According to Lieutenant Coleman, a visual observation involves a corrections officer taking the arrestee to a shower room where he directs the arrestee to remove his clothing and turn around while the officer checks the arrestee's front and back for deformities, bruises, marks, tattoos, and puncture wounds.  (Id., 11:9-21, 22:12-19, 24:1-21, 30:15-18.)  Lieutenant Coleman also drew a distinction between a visual observation and a strip search, claiming that the latter requires arrestees to bend down, squat, and lift their genitals.  (Id., 30:23-24.)

Juel Cole has worked at the Burlington Jail since 1976 and has been its warden since 1997.  Like the officers, Warden Cole confirmed that an arrestee admitted for a non-indictable offense is subjected to a visual observation, which involves an officer

"mak[ing] a quick check" on a nude inmate while he changes clothing or during his shower for bruises, tattoos, or "any item like that of any importance."  (Pl. Exh K, 25:10-26:2.)  Sometimes, though apparently not always, the officer conducting the visual observation will direct the nude arrestee to turn around to facilitate a full check of the arrestee's entire body.  (Id., 26:3-13.)  Interestingly, Warden Cole acknowledged that if he directed an inmate to remove his clothing, he would be telling the inmate to strip.  (Id., 31:7-10.)  However, according to Warden Cole, a visual observation of an arrestee's nude body does not constitute a "search" under the Burlington Jail's definition of that term.  (Id., 31:11-16.)

## 2.  Essex Jail's Procedures

The Essex Jail's inmate searching procedures during the proposed class period are based on two documents: (1) a document entitled "Department of Public Safety: General Order No. 89-17" (hereinafter "Order No. 89-17"); and (2) one called "Department of Corrections: Administrative Directive No. 04-06" (hereinafter "Directive No. 04-06").[4]  Order No. 89-17 went into effect in September 2002 and provides that, upon arrival at the Essex Jail, all arrestees shall be strip searched and then required to shower.  (See Calabro Cert., 8/2/07, Exh. D(1), p. 3, § V.A.2. & 3.)  It further states that a strip search is to consist of having an arrestee undress completely.  (Id., p. 4, § V.B.)  Officers are

---

[4]Order No. 89-17 and Directive No. 04-06 are both attached to as Exhibit D to an August 2, 2007 certification made by Michael Calabro, co-counsel for Plaintiff.  For the sake of pagination-related clarity, the Court will cite Order No. 89-17 as Exhibit D(1) and Directive No. 04-06 as Exhibit D(2).

supposed to "observe carefully while the inmate undresses." (Id.)  Moreover, officers are to examine the interior of the arrestee's mouth; his or her ears, nose, hair and scalp; his or her fingers, hands, arms, and armpits; and all body openings and the inner thighs.  (See id.)

Order No. 89-17 was superceded in April 2005 by Directive No. 04-06.  The latter document provides that officers are required to "[c]onduct a thorough search of individual inmates[.]" (Calabro Cert., 8/2/07, Exh. D(2), p. 4, § VII.c.5.)  It further directs officers to have all arrestees shower during intake.  (Id., p. 4, § VII.c.6.)  Moreover, officers are required to "[o]bserve and document" any evidence of notable body markings; body vermin or disease; and sores, wounds, or other injuries.  (Id., p. 4, § VII.c.7.)  In contrast with Order No. 89-17, Directive No. 04-06 facially prohibits strip searching non-indictable arrestees in the absence of reasonable suspicion that the search will produce a weapon, drugs, or contraband.  (See id., p. 4, § VII.c.8 (referring to the strip search procedures outlined in subchapter 10A:31-8 of the New Jersey Administrative Code).)

A number of Essex Jail officers and its warden testified concerning intake procedures at that facility.  Sergeant Thomas Logue has worked for the Essex Jail since 2005 and was on intake duty on March 9, 2005, the night Plaintiff was booked.  (Pl. Exh. O, 10:10-14.)  He testified that, for intake processing purposes, all arrestees are treated the same as one another, without any distinction based on whether the arrestee is accused of an indictable or a non-indictable offense.  (Id., 13:23-14:11.)  According to Sergeant

Logue, during processing, officers call up to three arrestees at a time to enter the shower area.  (Id., 19:21-23, 20:1, 21:16-18.)  Once there, corrections officers direct the arrestees to remove their articles of clothing and place them into gray bins.  (Id., 22:2-9, 22:23-23:1, 23:7-10.)  The arrestees then simultaneously undress completely while the officers view their nude bodies.  (Id., 23:2-6, 25:21-24, 33:22-34:5.)  Toward the end of his testimony, Sergeant Logue repeated that the same intake procedures are conducted for all arrestees irrespective of the nature of the charged offence.  (Id., 34:6-16.)

Officer Richard Monroig has worked at the Essex Jail since 1995.  Like Sergeant Logue, Officer Monroig testified that arrestees are never segregated based on the nature of their offense–i.e., indictable versus non-indictable–during the intake process.  (Pl. Exh. P, 9:21-10:1.)  Indeed, Officer Monroig explained that processing officers are not even trained as to which charges are indictable and which are not indictable.  (Id., 37:16-25.)  According to Officer Monroig, as part of the intake process, arrestees are lead, three at a time, to a shower area where officers direct them to remove their clothing and shower.  (Id., 12:12-15, 13:12-15, 13:21-24, 13:25-14:2, 14:22, 15:10-14, 17:7-9.)  The arrestees then take their clothes off and stand nude while an officer watches.  (Id., 16:3-5, 17:13-15, 21:15-18.)

Lieutenant Michael Salzano has worked for the Essex Jail since 1987.  He works in the shower room daily and is very familiar with the Essex Jail's intake procedures.  (Pl. Exh. Q, 6:13-16, 13:2-4.)  These procedures include a mandatory shower.  (Id., 12:11-23.)

10

To this end, officers bring up to three arrestees into the shower room at a time, and direct them to remove their clothing and take a shower.  (Id., 18:1-5, 20:19-25.)  Like Sergeant Logue, Lieutenant Salzano testified that this procedure is the same no matter whether the arrestee is admitted for an indictable or non-indictable offense.  (Id., 22:11-20, 32:13-19.)

Larry Glover has been the warden at the Essex Jail since 2004.  He testified that arrestees are searched to ensure they have no contraband.  (Pl. Exh. R, 24:8-10.)  This process includes having as many as three arrestees enter the shower area and remove their clothing, which officers then search.  (Id., 24:15-17, 25:5-6.)  The arrestees then shower and are directed to put on jail-issued clothing.  (Id., 24:20-22.)

### C.  Plaintiff's Class Action Allegations

Florence claims that the procedures described in the preceding paragraphs amount to strip searches even if, in the case of the Burlington Jail, the procedures involve a so-called "visual observation" or if, in the case of the Essex Jail, the written policy was recently revised to facially comply with New Jersey's strip searching rules.  In fact, Plaintiff alleges that

> Defendants have instituted a written and/or de facto policy, custom, or practice of strip searching all individuals who enter the custody of their Correctional Facilities regardless of the nature of their charged crime and without the presence of reasonable suspicion to believe that the individual was concealing a weapon or contraband.

(Am. Compl., ¶ 58.)  Thus, according to Plaintiff, each member of the class was the "victim[] of a blanket strip search upon [his] entry into Defendants' Correctional

11

Facilities." (Id., ¶ 64.)  Moreover, Plaintiff asserts that Defendants' officers had no

reasonable suspicion to support any of these alleged searches.  (Id., ¶ 67.)  Thus, Florence

maintains that the intake procedures violate the Fourth Amendment of the United States

Constitution, (id., ¶ 57,) which is made applicable to the States through the Fourteenth

Amendment.

Florence now moves to certify his class action claim.  He defines his proposed

class as follows:

> [A]ll arrestees charged with non-indictable offenses processed
> at Defendant Burlington County Jail and Defendant Essex
> County Correctional Facility from March 3, 2003 to the present
> date who were directed by Defendants' officers to strip naked
> before those officers, no matter if the officer's [sic] term that
> procedure a "visual observation" or otherwise, without first
> articulating a reasonable basis that those arrestees were
> concealing contraband, drugs or weapons.

(Pl. Proposed Order.)

## II.  DISCUSSION

"To obtain class action certification, plaintiffs must establish that all four

requisites of Rule 23(a) and at least one part of Rule 23(b) are met."  Baby Neal v. Casey,

43 F.3d 48, 55 (3d Cir. 1994).  In considering whether certification is proper, courts

refrain from inquiring into the merits of the action and accept the substantive allegations

in the complaint as true.  See Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177-78 (1973).

Nonetheless, courts will sometimes examine the allegations, see Barnes v. Amer. Tobacco

Co., 161 F.3d 127, 140 (3d Cir. 1998), because "the class determination generally

involves considerations that are 'enmeshed in the factual and legal issues comprising the plaintiff's cause of action,'" Coopers & Lybrand v. Livesay, 437 U.S. 463, 469 (1977) (citation omitted).  Finally, "[t]he interests of justice require that in a doubtful case . . . any error, if there is to be one, should be committed in favor of allowing class certification."  Eisenberg v. Gagnon, 766 F.2d 770, 785 (3d Cir. 1985).

With these general principles in mind, the Court will first consider whether Rule 23(a)'s prerequisites are satisfied in this case.  It will then analyze whether this action is maintainable under any of the three provisions in Rule 23(b).

### A.  Rule 23(a) Prerequisites

Rule 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a).  These requirements of numerosity, commonality, typicality, and adequacy of representation "'are meant to assure both that class action treatment is necessary and efficient and that it is fair to the absentees under the particular circumstances.'"  Barnes, 161 F.3d at 140 (quoting Baby Neal, 43 F.3d at 55).  The Court will consider each of these elements in turn.

13

*1. Numerosity*

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable[.]" "'No single magic number exists satisfying the numerosity requirement.'" Banda v. Corzine, Civil Action No. 07-4508 (WJM), 2007 U.S. Dist. LEXIS 80932, at *53 (D.N.J. Nov. 1, 2007) (quoting Moskowitz v. Lopp, 128 F.R.D. 624, 628 (E.D. Pa. 1989)).  However, the Third Circuit has previously held that the numerosity requirement will generally be satisfied "if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40." Stewart v. Abraham, 275 F.3d 220, 226-27 (3d Cir. 2001).

Although the Burlington County Defendants do not to contest numerosity, (see Burlington County Def. Br., p. 6,) the Essex County Defendants argue that the requirement is not satisfied in this case.  In particular, they claim that "Plaintiff has not supplied one person besides Mr. Florence who was allegedly strip searched." (Essex County Def. Br., p. 20.)  This assertion is simply incorrect.

Plaintiff attached to his moving papers records from both the Burlington and Essex Jails. (See Pl. Exh. T.)  These records contain detailed information for arrestees admitted to each facility on non-indictable offenses between March 3, 2003 and mid-March 2007. In total, there are 1,304 pages of records for the Burlington Jail and 1,134 pages for the Essex Jail, with an average of three arrestee entries per page.  By multiplying the average number of arrestees per page by the number of pages, it appears that there are

14

approximately 3,900 non-indictable arrestees who were admitted to the Burlington Jail

and about 3,400 who were admitted to the Essex Jail during the period in question.  Since

all non-indictable arrestees are subjected to the same intake processes at each

facility–processes which Plaintiff claims amount to suspicionless strip searches–the

proposed class likely includes several thousand individuals.  Joinder of such a large

number of plaintiffs would surely be impracticable.  Numerosity is therefore satisfied.

### 2.  *Commonality*

Rule 23(a)(2) requires that there be "questions of law or fact common to the

class[.]"  To satisfy this requirement, the named plaintiff need only show that he "share[s]

at least one question of fact or law with the grievances of the prospective class."  Stewart,

275 F.3d at 227 (citation omitted); see also Baby Neal, 43 F.3d at 56 (citation omitted)

("Because the requirement may be satisfied by a single common issue, it is easily met . . .

.")  Moreover, commonality does not require that members of the class share identical

claims, but that the plaintiff's interests are representative of the absent class members.  In

re Community Bank of N. Va., 418 F.3d 277, 303 (3d Cir.  2005).  Finally, an allegation

that the defendants' overall policy injured the plaintiffs satisfies the commonality

requirement.  See Danvers Motor Co. v. Ford Motor Co., Civil Action No. 02-2197

(DMC), 2007 U.S. Dist. LEXIS 7262, at *23-24 (D.N.J. Jan. 31, 2007).

Here, Florence and the unnamed proposed class members' claims involve the same

factual and legal theories.  They allege that they were all subjected to the same intake

procedures, which they claim involve suspicionless strip searching. Moreover, all the putative class members challenge the constitutionality of these procedures under the Fourth Amendment. Thus, all plaintiffs claim that they were injured in substantially the same way by the execution of Defendants' allegedly unconstitutional policies or practices under similar factual circumstances. For this reason, commonality is satisfied.

### 3. Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class[.]" "The typicality inquiry is intended to assess whether the action can be efficiently maintained as a class and whether the named plaintiffs have incentives that align with those of absent class members so as to assure that the absentees' interests will be fairly represented." Baby Neal, 43 F.3d at 57 (citations omitted). The inquiry asks whether the named plaintiff's individual circumstances or legal theories significantly differ from those of the unnamed putative class members. See id. However, the typicality requirement does not mandate that all putative class members share identical claims. Barnes, 161 F.3d at 141; Baby Neal, 43 F.3d at 56. Moreover, "factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." Barnes, 161 F.3d at 141 (citation omitted); see also Baby Neal, 43 F.3d at 58 ("Even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong

16

similarity of legal theories.").

In this case, Plaintiff alleges that the intake procedures he underwent while being admitted into the Burlington and Essex Jails amounted to an unconstitutional suspicionless strip search.  This claim is precisely the same as those of the absent putative class members because all non-indictable arrestees admitted to either facility are subjected to the same intake procedures, which require arrestees to remove their clothing while Defendants' officers view their nude bodies.  Florence's incentives in relation to this claim therefore seem to align perfectly with those of the rest of the putative class. Accordingly, the Court concludes that he has satisfied the typicality requirement.

Nonetheless, both sets of Defendants argue typicality is not satisfied in this case. The Essex County Defendants contend that Florence cannot satisfy typicality because he alleges that he suffered a body cavity search and not a strip search.  (See Essex County Def. Br., p. 16.)  However, this assertion is contradicted by the allegations in the Amended Complaint wherein Florence specifically claims that he was unconstitutionally strip searched.[5]  (See, e.g., Am. Compl., ¶ 64.)  The Essex County Defendants also argue that Florence's claim is atypical because he raises several civil rights claims solely on his own behalf in addition to his strip search class claim.  (See Essex County Def. Br., p. 20;

---

[5]It is true that Plaintiff also alleges he was subjected to the functional equivalent of a body cavity search at each jail.  (See, e.g., Am. Compl., ¶¶ 17, 26.)  However, Plaintiff confirms in his reply brief that he does not seek class certification on any claim relating to these allegations. (See Pl. Reply Br., p. 3.)  Instead, he seeks certification only in relation to his strip search claim. (See id.)

see also Am. Compl., Counts 1-2, 4-7.)  "This Court, however, has previously rejected the notion that class certification under Rule 23 is 'an all-or-nothing proposition' requiring class certification of all causes of action asserted in a single pleading."  Cannon v. Cherry Hill Toyota, Inc., 184 F.R.D. 540, 544 (D.N.J. 1999) (citation omitted) (finding the typicality requirement satisfied, despite the fact that the named plaintiff brought an individual claim in addition to the claims for which she sought class certification, because there was no indication that her interests failed to align with those of the absent class members).  Thus, the mere fact that Plaintiff brings additional claims on his own behalf does not render his unlawful strip search claim atypical of the unnamed putative class members' claims.

Additionally, the Burlington County Defendants argue that Florence does not meet the typicality requirement because he was housed in the Burlington Jail as a holdover awaiting transportation to Essex County, rather than being formally processed and admitted into the Burlington Jail for a non-indictable offense.  (Burlington County Def. Br., p. 7.)  It is worth repeating, however, that "factual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory."  Barnes, 161 F.3d at 141 (citation omitted).  Here, Florence's claim arises out of the same practice as the other putative class members' claims, i.e., Defendants' procedures that require non-indictable arrestees to remove their clothing while officers watch.  Likewise,

the same legal theory–unreasonable search under the Fourth Amendment–animates the representative and the absent plaintiffs' claims.  For these reasons, the distinction raised by the Burlington County Defendants does not render Florence's claim atypical.[6]

Both Defendants also raise a point that is more problematic for, but ultimately not fatal to, certification.  They claim Florence was actually arrested for the indictable offense of hindering prosecution in the third degree.  In other words, they argue that Plaintiff was not a non-indictable arrestee and is therefore precluded from membership in the class he seeks to represent.  Notwithstanding these representations, however, the Court concludes that Florence was most likely arrested on March 3, 2005 for a non-indictable offense.

Plaintiff's April 2003 warrant relates, indirectly, to certain offenses with which he was charged in 1998.  Some, if not all, of these 1998 offenses appear to have been crimes, which require indictment under the New Jersey Constitution.  However, most of these charges were dropped in exchange for Plaintiff's guilty plea to hindering prosecution (in violation of N.J. Stat. Ann. § 2C:29-3) and obstructing the administration of law (in violation of N.J. Stat. Ann. § 2C:29-1).  (See Burlington County Def. Br., pp. 4-5 & Exh. B.)  Both of these offenses can either be indictable crimes or non-indictable

---

[6]The Court notes that, to the extent Florence was not formally processed into the Burlington Jail, he is technically excluded from his proposed class because his class definition is limited to non-indictable arrestees who were processed at Defendants' jails.  (See, supra, p. 12 of this Opinion & Order.)  To rectify this problem, the Court will simply modify the class definition so that it will extend to arrestees who were processed, housed, or held over at Defendants' jails. See Weisfeld v. Sun Chem. Corp., 210 F.R.D. 136, 138 (D.N.J. 2002) (quoting Robidoux v. Celani, 987 F.2d 931, 937 (2d Cir. 1993)) ("'A court is not bound by the class definition proposed in the complaint . . . .'").

disorderly persons offenses, depending on the nature of the unlawful conduct at issue.

See N.J. STAT. ANN. § 2C:29-1(b); § 2C:29-3(b).  In Florence's case, they appear to have

been indictable.  (See Burlington County Def. Br. Exh. B.)

 At sentencing for these offenses, Plaintiff apparently received a probationary term

and a fine.  Over the course of time, Florence paid his fine in full.  Nonetheless, the Essex

County court's probation office believed that the fine was still outstanding.  The court

therefore set a date on which Plaintiff was appear so that the fine could be enforced.

Ultimately, Florence failed to appear for that enforcement hearing and the court therefore

issued a bench warrant for his arrest.  (See Pl. Exh. A.)  This warrant was a pre-printed

form and included spaces in which an indictment number and a charge were both

handwritten.  However, the indictment number written on the warrant was the same as the

number associated with the 1998 charges.  Likewise, the charge listed on the warrant was

third degree hindering prosecution, one of the two 1998 crimes to which Plaintiff had

previously pled guilty.  In other words, it appears that indictment and charge spaces on

the warrant were filled in to reference the old charges, rather than the new offense of

failing to appear for the enforcement hearing.  For the purpose of determining whether

Plaintiff was an indictable or non-indictable arrestee in March 2005, however, the critical

inquiry is really the classification of the offense an individual commits when he fails to

appear before a court.

 According to New Jersey's Criminal Justice Information Systems ("CJIS")

20

program,[7] the April 2003 warrant was issued pursuant to N.J. STAT. ANN. § 2A:10-1(c)[8]

and sought Plaintiff's arrest for civil contempt.  (See Burlington County Def. Exh. D.)

Although Plaintiff seems to suggest in his papers and at oral argument that civil contempt

is always a non-indictable offense, this appears not to be the case under New Jersey law;

instead, contempt may, in the court's discretion, be prosecuted summarily, i.e., without

indictment, or as a crime.  In re Buehrer, 236 A.2d 592, 603-04 (N.J. 1967).  However, in

a summary prosecution for contempt, the court may not impose a punishment in excess of

six months imprisonment, a fine of $1,000, or both.  Id.; see In re Yengo, 417 A.2d 533,

539 (N.J. 1980) (holding that there was no right to indictment for a lawyer who was

charged with civil contempt for failing to appear at a court hearing where the lawyer was

fined only $500 and sentenced to no jail term).

In this case, there is no evidence in the record suggesting that Florence was

charged with the variety of civil contempt that requires indictment.  For example, there is

no indication of any attempt to actually indict him for the alleged contempt.  Likewise,

there is nothing to suggest he would have been subjected to a sentence in excess of six

---

[7]The CJIS program is a statewide computerized information system that permits authorized users to access various criminal history files for arrest, prosecutorial, and custody information.  See website of the New Jersey State Police, Identification & Information Technology Section, http://www.state.nj.us/njsp/divorg/admin/iits.html (last visited March 14, 2008).

[8]Under N.J. STAT. ANN. § 2A:10-1(c), New Jersey courts are empowered to punish "[d]isobedience or resistance by any . . . any person whatsoever to any lawful writ, process, judgment, order, or command of the court."

months imprisonment or a $1,000 fine had he been found guilty of contempt.  Finally, there is testimony in the record suggesting that at least some of Defendants' officers believed Florence to be non-indictable and treated him accordingly.[9]

Ultimately, the record is not absolutely clear regarding whether Plaintiff was indictable or non-indictable.  On balance, however, it suggests the latter.  Given the Third Circuit's command that "[t]he interests of justice require that in a doubtful case . . . any error, if there is to be one, should be committed in favor of allowing class certification," Eisenberg, 766 F.2d at 785, the Court concludes that Florence was most likely arrested for the non-indictable variety of civil contempt.  Thus, the factual circumstances surrounding his commitment into Defendants' jails are typical of those of the class.

### 4.  Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class."  The adequacy requirement "encompasses two distinct inquiries designed to protect the interests of the absentee class members."  Barnes, 161 F.3d at 141.  First, it tests class counsel's qualifications to represent the class.  Id.; see Wetzel v. Liberty Mut. Ins. Co., 508 F.2d 239, 247 (3d Cir. 1975) ("[T]he plaintiff's attorney must be qualified, experienced, and generally able to conduct the proposed litigation[.]").  Second, it serves to uncover any conflicts of interest that exist between the

---

[9]For example, according to one Burlington Jail officer, Florence was not strip searched, but instead was "visually observed," because he was arrested for a non-indictable offense.  (See Pl. Exh. J, 24:15-25:2.)

named parties and the class as a whole.  Barnes, 161 F.3d at 141.  In other words, the
named plaintiff's interests must not be antagonistic to the unnamed class members.  See
Wetzel, 508 F.2d at 247.

In this case, Defendants do not challenge the adequacy of class counsel.  This fact,
combined with counsels' extensive qualifications, (see Pl. Br., pp. 32-35,) convince the
Court that counsel is "qualified, experienced, and generally able to conduct the proposed
litigation," Wetzel, 508 F.2d at 247.

Defendants do take issue with Florence's ability to adequately represent the
putative class as the named plaintiff.  However, their arguments are merely
recapitulations of those they previously offered in the context of typicality.  For example,
the Burlington County Defendants argue that Florence cannot adequately represent the
interests of the absent putative class members who were processed and admitted into the
Burlington Jail for non-indictable offenses because he was housed there as a holdover.
(See Burlington County Def. Br., p. 7.)  Likewise, the Essex County Defendants contend
that Plaintiff has a conflict of interest with the absent putative class members because he
additionally suffered alleged civil rights violations that are beyond the scope of the class
claims.  (See Essex County Def. Br., pp. 20-21.)

As noted above, however, the Court finds that Florence's interests are perfectly
aligned with those of the absent class members on the claim for which he seeks
certification.  There is no indication that Florence will be subjected to a unique defense at

23

trial that could cause his interests to diverge from those of the putative class members.

See Beck v. Maximus, Inc., 457 F.3d 291, 300 (3d Cir. 2006) ("To defeat class

certification, a defendant must show some degree of likelihood a unique defense will play

a significant role at trial.").  Simply put, Defendants have failed to identify any

compelling reason why Plaintiff's interests are antagonistic to the putative class.

Therefore, the Court concludes that Plaintiff will adequately represent the class.

### B.  Maintainability of this Action Under Rule 23(b)

To be certified, a class must not only satisfy the requirements of Rule 23(a), but

must also demonstrate that the action is maintainable under Rule 23(b)(1), (2), or (3).

Amchem Prods. v. Windsor, 521 U.S. 591, 613 (1997).  Rule 23(b)(3) provides in

relevant part

> (b) Types of Class Actions.  A class action may be maintained
> if Rule 23(a) is satisfied and if:
>
> * * *
> (3) the court finds that the questions of law or fact common to
> class members predominate over any questions affecting only
> individual members, and that a class action is superior to other
> available methods for fairly and efficiently adjudicating the
> controversy. The matters pertinent to these findings include:
>
> (A) the class members' interests in individually controlling the
> prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the
> controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the
> litigation of the claims in the particular forum; and

24

(D) the likely difficulties in managing a class action.

FED. R. CIV. P. 23(b)(3).  Class certification under this provision must satisfy the twin requirements of predominance and superiority.  Newton v. Merrill Lynch, Pierce, Fenner & Smith, LLC, 259 F.3d 154, 186 (3d Cir. 2001).  Each will be discussed in turn.

### 1. Predominance

Rule 23(b)(3)'s predominance element incorporates, and is more demanding than, the commonality requirement of Rule 23(a).  In re Warfarin Sodium Antitrust Litig., 391 F.3d 516, 528 (3d Cir. 2004).  Predominance requires that common issues predominate over issues affecting only individual class members.  Id.  The inquiry therefore "focuses on whether the efficiencies gained in resolving these common issues together are outweighed by the individual issues presented for adjudication."  Cannon, 184 F.R.D. at 545 (citation omitted).  "That common issues must be shown to 'predominate' does not mean that individual issue[s] need be non-existent.  All class members need not be identically situated upon all issues, so long as their claims are not in conflict with each other."  Id. (citation omitted).

In this case, the Essex County Defendants contend that predominance has not been established because there will likely be individual issues concerning each arrestee's background and record.  (See Essex County Def. Br., p. 21.)  Presumably, they are arguing that liability will turn on whether particular searches of particular arrestees were constitutionally justified.  This argument is unpersuasive.

As an initial matter, it is worth noting generally that courts have previously rejected arguments similar to the one offered by the Essex County Defendants.  For example, in Johnson v. District of Columbia, a class action strip search defendant claimed that common issues failed to predominate because the case would focus on whether each individual arrestee was searched without a sufficient constitutional basis, which would in turn require a detailed inquiry into all the facts and circumstances known about each arrestee.  Civil Action No. 02-2364 (RMC), 2008 U.S. Dist. LEXIS 9069, at *26-27 (D.D.C. Feb. 8, 2008).  The court disagreed and explained that the plaintiffs challenged whether the defendant had a policy or practice of subjecting proposed class members, regardless of charge, to a particular strip search procedure and whether this procedure violated the Fourth Amendment.  Id. at *27.  This, the court found, could be resolved by reference to generalized proof.  Id.

This case is similar to Johnson insomuch as Plaintiff challenges whether Defendants' have a policy or practice of using intake procedures for non-indictable arrestees that are tantamount to suspicionless strip searches.  This issue is at the heart of each putative class members' claim and turns on generalized, not individualized, proof.

This point is made especially clear in light of the District of New Jersey's strip search jurisprudence, under which the constitutionality of a strip search turns on the existence of reasonable suspicion that an arrestee is concealing weapons or contraband.  See, e.g., Davis v. City of Camden, 657 F. Supp. 396, 399 (D.N.J. 1987).  This requisite

suspicion can be supplied in either of two ways: (1) "the specific circumstances relating to the arrestee or the arrest," or (2) "the nature of the charged offense." Id. at 400.  Thus, Davis did not prohibit blanket strip search policies; it simply requires them to be predicated on some application of the reasonable suspicion standard.  See id. (stating that a blanket strip search policy would likely be constitutionally acceptable if it applied only to individuals who were charged with felonies or with misdemeanors involving weapons or contraband).

In this case, Plaintiff defines the proposed class to include *only* those non-indictable arrestees for whom there was *no* predicate articulation of reasonable suspicion. (See, supra, p. 12 of this Opinion & Order.)  Additionally, the record indicates that all arrestees at the Essex Jail are subjected to the same intake procedures without regard to the nature of their charged offense.[10]  (See Pl. Exh. O, 13:23-14:11, 34:6-16; Pl. Exh. P, 9:21-10:1; Pl. Exh. Q, 22:11-20, 32:13-19.)  The Court therefore disagrees with the notion that liability will turn on individual questions relating to the justification for strip searches of particular arrestees.  Rather, liability will seemingly boil down to whether the intake procedures, which require Defendants' officers to view the nude bodies of non-indictable arrestees, are tantamount to strip searches.  This is a common question and, as previously stated, is subject to generalized proof.

---

[10]Although the Burlington County Defendants do not contest predominance, the Court notes that there is similarly testimony in the record indicating that all arrestees at the Burlington Jail–whether indictable or non-indictable–are subjected to the so-called "visual observation." (See Pl. Exh. F, 17:14-19, 27:1-7; Pl. Exh. H, 54:4-12.)

The Essex County Defendants also argue that individual issues will predominate over common issues because each putative class member will have to present his own proof of damages depending on the scope of the illegal search he allegedly suffered.  (Id., pp. 19, 21.)  The Court certainly accepts that some members of the putative class may have suffered more invasive searches, and would therefore be entitled to greater damages, than others.  However, the Third Circuit has previously held that "the necessity for calculation of damages on an individual basis should not preclude class determination when the common issues which determine liability predominate."  Bogosian v. Gulf Oil Corp., 561 F.2d 434, 456 (3d Cir. 1977).  Indeed, courts routinely find predominance satisfied in class action strip search cases notwithstanding the possibility that an individualized calculation of damages may be necessary.  See, e.g., Johnson, 2008 U.S. Dist. LEXIS 9069, at *28; Marriott v. County of Montgomery, 227 F.R.D. 159, 173 (N.D.N.Y. 2005).  In fact, the Johnson court even highlighted several ways of dealing with possible individualized damages issues, such as:

> (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class.

Johnson, 2008 U.S. Dist. Lexis 9069, at *29.  For these reasons, the Court finds that predominance is satisfied notwithstanding the possibility that there will be issues of

28

individualized damages.

## 2. Superiority

The superiority analysis focuses on whether a class action is the best method for achieving a fair and efficient adjudication.  Newton, 259 F.3d at 186.  To this end, Rule 23(b)(3) provides a non-exhaustive list of several factors to help determine whether a class action is the superior method of adjudication:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

FED. R. CIV. P. 23(b)(3).

In this case, each factor favors class certification.  First, it appears that putative class members would have little interest in pursuing individual claims against Defendants. "It is generally recognized that class certification is preferred where 'the recovery being sought by each of the plaintiffs is not sufficiently large to render individualized litigation a realistic possibility.'"  Cannon, 184 F.R.D. at 546 (quoting In re Ford Motor Co. Ignition Switch Prods. Liab. Litig., 174 F.R.D. 332, 351 (D.N.J. 1997) (in turn citing Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 809 (1985))).  Plaintiff contends, and neither set of Defendants dispute, that strip search class actions nationwide average

settlements of only $1,500 per person.  (Pl. Br., p. 23.)  Given the relatively small

economic stake that any one class member has in this case, the Court concludes that the

first factor favors class treatment.

The second factor also favors class certification.  The Court is unaware of any

other strip search litigation pending against the Essex County Defendants by potential

class members.  And while another class action has recently been filed in this Court

arising out of the intake procedures at the Burlington Jail, see Haas v. Burlington County,

Civil No. 08-1102 (JHR), this parallel case is in its infancy and therefore does not militate

against certification here.

The third factor favors certification because it is generally "desirable to litigate

similar, related claims in one forum."  Cannon, 184 F.R.D. at 546 (citation omitted).

Lastly, the Court has no reason to believe there will be any difficulty in managing this

case.  Therefore, the fourth factor also points to the superiority of class treatment in this

case and the Court accordingly finds that superiority is met.

### C.  The Essex County Defendants' Remaining Arguments

The Essex County Defendants raise several additional arguments, both in their

opposition papers and at oral argument, to which the Court will now respond.  However,

none of these arguments is particularly persuasive.

The Essex County Defendants argue at length that Plaintiff has not proven a

constitutional violation of the variety contemplated by Monell v. Department of Social

Services, 436 U.S. 658 (1978).[11]  To this end, they cite cases that stand for the proposition that a government entity will be held liable for unlawful strip searching only if the plaintiff presents sufficient evidence that the search was conducted pursuant to the government's policy or practice.  See Turner v. Knight, 121 Fed. Appx. 9, 15-16 (4th Cir. 2005); Loeber v. Count of Albany, 216 F. Supp. 2d 20, 23 (N.D.N.Y. 2002).  Relatedly, they cite to cases suggesting that an officer's incidental or accidental viewing of an arrestee's nude body does not amount to an unconstitutional strip search.  See, e.g., Wood v. Hancock 354 F.3d 57, 65 (1st Cir. 2003).

Relying on these principles, the Essex County Defendants argue that the evidence in the record reveals no policy or practice of conducting illegal strip searches at their jail. At most, they claim, any viewing of arrestees' nude bodies by their officers was inadvertent and therefore not a constitutional violation.  They attempt to lend some inferential support to their argument by noting that, since 2005, their intake procedures included the use of a device which scans fully-clothed arrestees for contraband, which ostensibly suggests that there would be no need to conduct widespread strip searches. Moreover, they point to the fact that a state ombudsman charged with overseeing the county jails in New Jersey has never received a complaint about illegal strip searching in Essex County.

---

[11]In Monell, the Supreme Court held that a municipality may be held liable under 42 U.S.C. § 1983 only when the plaintiff proves that he was injured as a result of the execution of the municipality's policy or custom.  Monell, 436 U.S. at 694.

31

The Court rejects these arguments as irrelevant, at least in the present context.  In essence, the Essex County Defendants are attempting to contest the merits of Florence's case.  A motion for class certification is hardly the appropriate occasion for such a challenge because, in considering whether certification is proper, courts refrain from inquiring into the merits of the action and accept the substantive allegations in the complaint as true.[12]  See Eisen, 417 U.S. at 177-78.  If the Essex County Defendants wished to challenge Plaintiff's proofs at this juncture, they should have filed a motion for summary judgment along with their opposition to the motion for certification.  They did not do this and the Court will therefore save an analysis of the merits for some other day.

The Essex County Defendants next argue that, if the Court certifies the class, it should bifurcate the eventual trial to determine separately liability and damages.  The Court agrees that bifurcation may be a suitable way with which to deal with individualized damages issues should they arise.  (See, supra, p. 28 of this Opinion & Order.)  However, the Court is not yet persuaded that these issues will necessarily arise.  For this reason, the Court will not order bifurcation at this time, but will revisit the issue

---

[12]The Court notes that the Essex County Defendants cite to a case called Gustafson v. Polk County, 226 F.R.D. 601, 606 (W.D. Wis. 2005), in which a court seemed to analyze the merits of a plaintiff's unlawful strip search case in the course of ruling on her motion for class certification.  However, the court did this only because the proposed class definition included individuals who, under the law in that jurisdiction, could constitutionally be strip searched.  See id.  As such, the court found that the plaintiff's challenge did not pose a question that was common or typical to the proposed class.  See id.  In this case, by contrast, Florence's proposed class includes only individuals against whom a strip search would be unlawful under District of New Jersey case law.  Moreover, as previously discussed, Plaintiff has satisfied commonality and typicality, as well as the other requirements of Rule 23.

at any party's request as this case nears trial.

Third, the Essex County Defendants note that under <u>Davis</u>, 657 F. Supp. 396, a strip search is not necessarily unconstitutional.  They therefore request that the Court redefine the proposed class to exclude "those persons who were lawfully searched . . . ." (Essex County Def. Br., p. 25.)  As an initial matter, this proposal is fatally flawed because of its highly circular in nature.  It would require an individual to prove he was unlawfully strip searched as a precursor to class membership.  However, no one could prove this until, after having already been admitted to the class, the action is resolved favorably to the plaintiffs.  For this reason alone, the Court could not redefine the class as requested.  <u>See</u>, <u>e.g.</u>, <u>Vinson v. Seven Seventeen HB Phila. Corp No. 2</u>, Civil Action No. 00-6334, 2001 U.S. Dist. LEXIS 25295, at *52 (E.D. Pa. Oct. 31, 2001) (citation omitted) ("Where a proposed class requires the court to address 'the central issue of liability' in the case, the class definition may be untenable.").

More importantly, the modification requested by the Essex County Defendants is unnecessary; Plaintiff's proposed class definition already takes into account the fact that strip searches are not necessarily unconstitutional under <u>Davis</u>.  Again, <u>Davis</u> requires strip searches to be based on reasonable suspicion, <u>see</u> 657 F. Supp. at 399, which can be supplied either by specific facts known about the arrestee or the arrest, or by the nature of the charged offense, <u>id.</u> at 400.  Here, the record indicates that all arrestees at the Essex Jail are subjected to the same intake procedures without regard to the nature of their

33

charged offense.  (See Pl. Exh. O, 13:23-14:11, 34:6-16; Pl. Exh. P, 9:21-10:1; Pl. Exh.

Q, 22:11-20, 32:13-19.)  Moreover, Plaintiff's proposed class definition includes only

those non-indictable arrestees whose alleged strip searches were not predicated on an

articulation of reasonable suspicion.  Therefore, the only arrestees included in Plaintiff's

proposed class definition are those against whom a strip search would be unlawful.

    Finally, the Essex County Defendants observed at oral argument that the Essex Jail

houses an unusually large number of violent offenders.  They further observed that the

Third Circuit has never addressed the constitutionality of blanket strip search policies.

Instead, there are only opinions from the District of New Jersey, such as in Davis.

Frankly, the Court is uncertain of the point the Essex County Defendants are trying to

make.  If they are suggesting that the large number of violent offenders in their facility

somehow obviates their need to comply with the law, they are mistaken.  They are

similarly mistaken if they believe that the absence of an opinion from the Court of

Appeals casts doubt on the underlying legal principle that suspicionless strip searching is

unlawful; Davis is an opinion of this Court and is therefore the law within this District.

    The Court finds that Plaintiff has carried his burden under Rule 23 notwithstanding

Defendants' arguments to the contrary.  Accordingly, certification will be granted.

### D.  Notice to Potential Class Members

Federal Rule of Civil Procedure 23(c)(2)(B) provides that, in any class action

maintained under Rule 23(b)(3), notice shall be given to the class in the best practicable

manner.  Although the Court is in receipt of Plaintiff's proposal regarding notice, (see Pl.

Br., pp. 35-36,) it will refrain from authorizing this plan until it has heard from both

Defendants on this issue.  Defendants are hereby instructed to submit their positions in

writing within 15 days of the date of this Opinion & Order.  To the extent that Plaintiff

then feels it necessary to do so, he may respond to Defendants' positions within 7 days

thereafter.

### E.  Appointment of Class Counsel

Rule 23(g)(1) requires the Court to appoint class counsel.  As previously

discussed, the Court finds that Plaintiff's counsel is "qualified, experienced, and generally

able to conduct the proposed litigation," Wetzel, 508 F.2d at 247.  The Court will

therefore appoint them as class counsel.

### III.  CONCLUSION

For the foregoing reasons, as well as those placed on the record during oral

argument on February 27, 2008,

**IT IS THIS** 20th day of March, 2008 hereby

**ORDERED** that Plaintiff's motion for class certification [73] is **GRANTED**; and

**IT IS FURTHER ORDERED** that the class hereby certified is defined as:

> All arrestees charged with non-indictable offenses who were
> processed, housed or held over at Defendant Burlington County
> Jail and/or Defendant Essex County Correctional Facility from
> March 3, 2003 to the present date who were directed by
> Defendants' officers to strip naked before those officers, no
> matter if the officers term that procedure a "visual observation"

35

or otherwise, without the officers first articulating a reasonable
belief that those arrestees were concealing contraband, drugs or
weapons;

**IT IS FURTHER ORDERED** that Defendants submit in writing within 15 days
of the date of this Opinion & Order their positions regarding Plaintiff's proposal for
handling notice to potential class members; and Plaintiff, to the extent he feels it
necessary, may respond to Defendants' submissions within 7 days thereafter; and

**IT IS FURTHER ORDERED** that Plaintiff's attorneys are appointed as counsel
for the class.


  /s/ Joseph H. Rodriguez
JOSEPH H. RODRIGUEZ
United States District Judge