*UNITED STATES DISTRICT COURT*
*DISTRICT OF NEW JERSEY*
-------------------------------------------------------------

**Albert W. Florence,**

**Plaintiff,**

-against-

**Board of Chosen Freeholders of the County of**
**Burlington; et. al.**

**Defendants.**
-------------------------------------------------------------------

**Case No. 05-3619(JHR)**

**CERTIFICATION of**
**SUSAN CHANA LASK, ESQ.**

 

I, SUSAN CHANA LASK, ESQ., of full age do certify under penalty of perjury as follows:


1. I am appointed class counsel in this matter. This case was filed July 20, 2005.

2. Attached as Exhibit A is the August 14, 2008 Ray Sabbatine report stating Defendants violate Plaintiffs' constitutional rights by their unlawful blanket strip seraching without articulating reasonable suspicion.  The report is completely contrary to any testimony he gave when he was an expert for a defendant prison facility in the *Knox* case referred to by Defendants in their Brief.

3.  I informed Defendants on or about August 15, 2008 that Mr. Sabbatine would not be Plaintiff's expert.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.


Dated: September 22, 2008

/s Susan Chana Lask

_____

SUSAN CHANA LASK, ESQ.
Law Offices of  Michael V. Calabro
466 Bloomfield Avenue, Suite 200
Newark, New Jersey 07107
(973) 482-1085

EXHIBIT A

**Albert W. Florence**

**V**.

**Burlington County et al.**

**U.S. District Court**

**District of New Jersey**

**Case No.: 05cv 3619 (JHR)**

**I.        INTRODUCTION**

I have been asked to offer my opinion as to the claim that Albert W. Florence was illegally strip searched during processing in Burlington and Essex County on a contempt of court charge, a minor non- indictable offense.

**II.        QUALIFICATIONS**

My recent Curriculm Vitae is attached**.**  I have been employed in the criminal justice system since 1972 when I held the position of regional administrator for the Kentucky Crime Commission. I assisted local units of government in planning for and administering block grant monies from the Law Enforcement Assistance Administration (LEAA). In 1973 I then became the Assistant Director of the local criminal justice planning agency in Lexington, KY. I returned to Kentucky State Government in 1974 to work in the Office of the Secretary in Kentucky's first Department of Justice. I administered the Kentucky Criminal Justice Standards and Goals Grant and staffed the Juvenile Justice Committee of that program.

In 1976 I accepted the position of Jail Administrator in Lexington, Kentucky, closing two old jail facilities and opening a new 500 bed facility that year. Since 1976 I have been involved in several facility expansions and renovations as well as the planning and construction oversight of the recently completed 1200 bed facility. During my 25 year tenure as both an appointed and elected official my division has expanded into a community corrections model with responsibilities for juvenile and adult detention, adult misdemeanant probation, drug testing, day reporting, electronic monitoring and community service work programs. I retired from my last position of Director of Community Corrections in August 2001.

My teaching and consulting activities began in the 1980's. I instructed Corrections courses at Eastern Kentucky University. I have been a certified instructor of correctional curriculum since early 1980. I have taught and consulted for the National Institute of Corrections since 1990. I have assisted in developing policies and procedures for jails throughout the country for the last thirteen years. My areas of specialization are Classification, Strip Search, Mission Based Management, Suicide Prevention and Mental Health Crisis Management. I am also on the faculty of the Americans for Effective Law Enforcement (AELE) where I instruct at seminars on topics of Inmate Classification, Strip Search Policy Development, Inmate Discipline and Inmate Property Rights.

In recent years I have become involved in litigation consultation and expert witness work for both the plaintiff and the defense. These cases primarily involved inmate classification, strip search and in custody deaths.

EXHIBIT A

I believe my 30 years plus experience in planning, development, administration, training and public policy development qualify me to render expert consultation and opinion in the field of Corrections.

**Publications**

"A New Strip Search Paradigm", American Jails, November 1996, Ray Sabbatine co authored by Donald L. Leach, PH, D

"Journey into OJC", American Jails", January 1999, Ray Sabbatine co authored by Donald L. Leach, PH, D

"Governmental Design/Build: A Community Corrections Model" American Jails, January 2001

"The Design-Build Delivery Method: A Successful Process, Corrections Today, April 2001

"KACo Jail 'Best Practices' Risk Management Manual", January 2003, Ray Sabbatine co authored by Donald L. Leach, PH, D

"KACo Jail "Objective Jail Classification", January 2003/4/8, Ray Sabbatine co authored by Donald L. Leach PH, D

"Kentucky Correctional Prevention Programs Offer Keys to Reducing Inmate Suicide", Preventing Suicide, September 2003

"Innovations to Reduce Jail Suicide- A Kentucky Initiative", Jail Suicide/Mental Health Update, Spring 2004

### III.    COMPENSATION

My rate of compensation is $150.00 per hour for research, consultation and report generation. My fee for testimony is $2000 per day or any part of a day and $1000 per day for travel or onsite consultation plus all reasonable expenses.

### IV.    MATERIALS REVIEWED

I reviewed the following materials **to date** in formulating my opinion in this case;

· First Amended Civil Complaint Adding Class-Action Claim to Count Three Herein, dated June 30, 2006

· Motion for Class Certification, dated September 19, 2007

· Opinion and Order of Honorable Rodriguez, dated March 20, 2008

· Essex Search Policy, "Search of Inmates and Facility", Directive No. 04-36, Effective 2-1-07

· Essex Search Policy,"Reception/Classification" Order No. 89-17, Effective 9-27-02

· Essex County Corrections "Prisoner Intake/Discharge" Strip Search Policy, effective February 1, 2007

· Essex Documents: Bench Warrant & Essex County Prosecutor Entry request, both issued August 25, 2003;Office of the Sheriff Address Information Request, dated May 29, 2003;Esex County Sheriff's Office "Report of Arrest", dated March 9, 2005; New Jersey Promis/Gavel, dated January 3, 2006; Det. John Minneli Pick Up Sheet "ready for PickUp March 9, 2005", dated March 8, 2005;

Essex County Sheriff's Office Report of Arrest, "Charge:VOP/Hinder Prosecution", dated March 9, 2005;Bulrington County Detention Center, 2 pages (prints, Doc Sheet) dated March 8, 2005.

· Essex Jail Intake of Albert Florence (12 pages of Screen Print Listings and Inmate Information), "Charge Statue Code:2C:29-3

· Essex County Sheriff's Officer General Order "Prisoner Searches" No. 02-20, Effective October 15, 2002

· Essex Deposition Transcript Digests: Glover, Logue, Monroig, Salzano

· Burlington "Policies and Procedures" "Inmate Urinalysis", Section 1188, Effective January 1, 2004 (2 pages)

· Burlington Response to Document Request, dated  July 11, 2006

· Burlington "Standard Operating Policy and Procedure Manual" Secs. 10000-1292 Index Only; Section 1186, Search of Inmates, Effective Date January 1, 2004, including Strip Search Authorization Form (8 pages)

· Burlington/Cole's response to Plaintiff's  Request for Production of Documents, dated (1-17 responses, 5 pages)

· Burlington Deposition Transcript Digests: Coleman, Gallagher, Palmer,Reeder, Warden Cole

· Class Attorney Lask Letter to Defendant Burlington Counsel Savage regarding discovery needed, dated October 29, 2006

## V. EXAMINATION

At the outset, it is important to note that this report is based upon the facts as presented by the material and specifically avoids drawing conclusions based upon credibility issues of the parties. Also, it is not to draw a legal conclusion, but to utilize the information generally used for jails in developing acceptable policy and procedure that I refer herein to certain key cases and law that clearly establish strip search policies.  Many times in our training we utilize controlling case law for training Officers.  The baseline in training would be some times higher than case law, which is an insurer's decision to go above legal baseline, but usually not enough to interfere with jail security.

The Supreme Court beginning with *Bell v. Wolfish*, 441 U.S. 520 (1979) has clearly established that a jail can strip search an offender when there is "reason to believe" that the offender is in possession of a contraband.  The "reasonable belief" standard in strip search cases has been predicated upon a belief in an offender's possession of weapons, drugs or other findings of "dangerous contraband" that poses a threat to the public, officers or incarcerated offenders.  As Federal case law has evolved, it has been clearly established that "reasonable belief" justifies a strip search when those offenders that have been charged with criminal offenses or behaviors denote:

· Violence

· Drug possession

· Possession of dangerous contraband posing a potential threat to self or others

3

In the case of Albert Florence, the "reasonable belief" standard justifying a strip search was never established in either of the facilities within which he was processed. Mr. Florence was arrested on the evening of March 3, 2005 on a civil contempt warrant by a trooper with the New Jersey State Police. According to testimony in depositions by various witnesses, the civil contempt warrant is, and I reiterate their words, a "non-criminal minor civil offense". A "non-criminal civil offense" fails to meet the "reasonable belief" standard required to justify a strip search; therefore, any strip search of an offender charged with a "non-criminal civil offense" would constitute an illegal strip search in violation of a person's 4th Amendment rights.

Regardless of the nuances in the terminology of "visual observation" versus "strip search" used by either Burlington or Essex County detention facilities, Federal Supreme Court case law (*Bell v. Wolfish*, 441 U.S. 520 (1979), and cases specific to New Jersey and the 3rd Federal Circuit Court of Appeal (*Davis v. City of Camden*, 657 F. Supp. 396, 399 (D.N.J. 1987); *Ernst v. Borough of Fort Lee*, 739 F. Supp. 220 (DNJ,1990); *O'Brien v. Borough of Woodbury Heights,* 679 F.Supp. 429 (D.N.J.1988); *Roderique v Kovac* 1987 WL 17058 (DNJ); *DiLoretto v. Borough of Oaklyn*, 744 F.Supp. 610 (DNJ,1990)), have clearly established that the removal of an arrestee's clothing in those situations when there is an expectation of privacy thereby exposing them to the viewing of part or all of the body is considered an illegal strip search. Nine of the other ten Federal Circuit Courts of Appeal have ruled similarly to the 3rd Circuit in their opinions regarding the constitutional basis for a strip search as being rooted in the establishment of "reasonable belief"; and therefore, absent the establishment of "reasonable belief" the strip search is unconstitutional.

Both Burlington and Essex Counties' Officers admitted in their depositions to the viewing of Mr. Florence in the absence any clothing ("naked") for the purpose of body examination, showering and clothing exchange by a correctional officer. The Warden of Burlington County Detention admits that it is the practice of the Officers in his facility to "visually observe" all arrestees, both non-indictable and indictable. The viewing of Mr. Florence "naked" by both Burlington and Essex County Correctional Officers occurred in the absence of a "reasonable belief" that Mr. Florence was in possession of dangerous contraband either by virtue of his charge or demeanor. These actions by the correctional officers involved with the processing of Mr. Florence constituted an illegal strip search.

Any strip search policy that fails to even attempt to establish the propriety of a legal strip search based upon "reasonable belief" creates a blatant disregard for every arrestee's Fourth Amendment right to be free from an unreasonable search.

### Burlington County policy

Mr. Florence was arrested and booked into Burlington County Detention Facility for a non-indictable offense on the evening of March 3, 2005. By virtue of Burlington's Policies and Procedures, "Search of Inmates", Section 1186, F, 1, dated January 1, 2004, "A person that has been detained or arrested for commission of an offense other than a crime and who is confined in an Adult Correctional facility **shall not** be subject to a strip-search unless there is reasonable suspicion that a weapon, controlled dangerous substance or other contraband will be found." Further, Burlington Policies and Procedures, "B.C.D.F. – Booking Officer(s)", Section 1277 dated January 1, 2004, Section 4, a, 1 stipulates that "…inmates committed on non-indictable charges shall not be stripped searched, however to shower and change into a jail issued uniform." This same policy mandates that Officers

must "visually observe" inmates while showering to ensure application of Kwell to all areas of the inmate's body ("Officers will ensure the inmate applies Kwell to all areas on the body except the eyes." Section 4, b, 2)  The condition that all arrestees with non-indictable offenses be showered and visually observed while showering constitutes a strip search.

In their depositions Officers Reeder, Palmer, Gallagher and Coleman, along with Warden Cole admitted to routinely conducting a "visual observation" of all arrestees.  These "visual observations" occurred regardless of the status of the offenders – either "a person that has been detained or arrested for commission of an offense other than a crime" or "an inmate lawfully confined". This requirement is therefore a "blanket policy" of strip searching all arrestees booked into the Burlington County Detention Center.  Mr. Florence was subjected, along with all other arrestees, to the "blanket strip search" policy.  In referencing the New Jersey Administrative Code, section 10A:31-8.5 the case note for Davis v. City of Camden, 675 F. Supp. 396 (D.N.J. 1987) states "Strip search of newly admitted inmate found unjustified absent suspicion of concealed weapons or contraband: blanket strip search of all arrestees mandated by former rule found unconstitutionally supportable."  Therefore, the "visual observation" constitutes an illegal strip search of Mr. Florence and is a violation of his 4th Amendment right to be free from unreasonable search.

**Essex County policy**

Mr. Albert Florence was booked into Essex County for VOP-Hindering Prosecution, a minor non-indictable offense on March 9, 2005.  Essex General Order Number 89-17 Policy V, A, 2, dated 9-27-2002 states, "Place the inmate in the reception area where the inmate shall be stripped searched…" There is no further mention of any criteria circumscribing the parameters for the conduct of a strip search of arrestees regardless of the nature of their offense.  This policy fails to articulate the criteria the Federal Courts have deemed necessary for the establishment of "reasonable belief" that a person is in possession of dangerous contraband.  Therefore, according to Order Number 89-17, it was the policy of Essex County at the time of Mr. Florence's booking on March 9, 2005, to conduct a strip search of all arrestees in the absence of any articulated "reasonable belief".

Again, referencing N.J.A.C. 10A:31-8.5 case note, in Davis v. City of Camden, 675 F. Supp. 396 (D.N.J. 1987), "Strip search of newly admitted inmate found unjustified absent suspicion of concealed weapons or contraband: blanket strip search of all arrestees mandated by former rule found unconstitutionally supportable."  The Essex County requirement to strip search all arrestees constitutes a "blanket strip search" policy to which Mr. Florence was subjected.  This constitutes an illegal search of Mr. Florence and is therefore violating his 4th Amendment right to be free from unreasonable search.

Deposition testimony from Essex County Warden Glover, Lieutenant Salzano, Sergeant Monroig and Officer Logue all indicated that it was common policy, practice and custom to observe all arrestees "naked" while undressing and then showering.  Even Essex County's Warden Glover indicated that he has the expectation that Officers were to observe all arrestees as they exited the shower naked for the purpose of identifying tattoos, scars, body marks and open sores.  The testimony of all Essex staff further indicates that multiple arrestees would be processed together naked and in close proximity further exacerbating the injury to the rights of arrestees.  All indicated that these

actions were undertaken without regard to the nature of the arrestee's offense.  Officers had even set up a chair outside the showers to facilitate their observations of the arrestees.

### Training issues

The depositions from Officers of both facilities indicate a significant lack of training in strip search policy.  In some cases the strip search training occurred many years before – 10 years for Monroig.  Both facilities indicate a deficiency of ongoing in-service training – according to Reeder from Burlington, Salzano, Logue and Monroig from Essex.   Additionally, while Officer Reeder acknowledges training hundreds of Officers and civilians in jail policy and procedures he indicates that he is training them in practices that are in direct contravention of the strip search case law.  Although there is recognition of the attempt on the part of Burlington County to establish reasonable belief as a standard for which strip searches would occur, Warden Cole, through both policy and practice, violated the basic tenants **tenets** of legal strip search by permitting the illegal visual observation of naked arrestees by Officers in the shower areas.

### Lack of policy required documentation

Both Burlington and Essex Counties have policies that mandate the proper documentation of all "visual observations" and/or strip searches.  In deposition testimony this requirement of policy is recognized; yet the search documentation (either visual observation or strip search) for Mr. Florence is invalid and incomplete pertaining to Burlington, or completeley absent pertaining to Essex.  Despite Plaintiff's requests, these documents for all arrestees from either county have not been presented for examination.  There is some indication in the testimony of Warden Cole that at Burlington County the form was completed, while Officer Logue maintains that he has never completed a strip search form. Without the requisite documentation we must rely on the deposition testimony and the policies of both Essex and Burlington to ascertain the nature of the search conducted on Mr. Florence and all those processed at these facilities.  This lack of search documentation jeopardizes the justification and reliability of the processes used in both facilities.  It is the failure to properly document the propriety of strip search that contributes to the egregiousness of every arrestees' civil rights violation.

### Indictable versus non-indictable

Although non-indictable offenses would likely include those charges for which "reasonable belief" is not likely to be established, the contrary regarding indictable offenses is a false assumption. Although criminal charges are indictable, many offenses are nonviolent and non-drug indictments that would fail to meet the standard of "reasonable belief" justifying a legal strip search.  Beyond the violation of Mr. Florence's rights is the concern that the current policies, procedures and practices violate the rights of not only non-indictable offenders but of many other offenders that have been strip searched without establishing a "reasonable belief" necessary to justify the strip search.

Burlington and Essex Counties continue to base their legal strip search on criteria such as indictment, presence of scars, gang tattoos, vermin and other non objective elements of "reasonable belief" that have not been upheld in the Courts.  They further aggravate the grievous nature of these searches by calling them something other than a strip search in their policies; in this case, a "visual observation".  This use of language in the policy could be considered to be but a subterfuge used to

continue the indiscriminate illegal strip searching of all arrestees which seems to be the case for both counties.

Many offenders are likely to be subjected to an illegal strip search under the current policies, procedures and practices of both Burlington and Essex Counties. Many legally strip searchable offenders are likely to undergo a less than thorough legal strip search because they are overwhelming performing visual observations. According to the deposition of Officer Monroig he has never himself conducted a strip search. One would have to assume that he was conducting visual observations on arrestees he has processed. This type of practice exposes other offenders to dangerous contraband thus creating a "failure to protect" condition. Even the Officers are placed in greater danger when offenders are improperly searched.

**Establishing "Reasonable Belief"**

The evolving Federal case law of legal strip search policy has continued to challenge many aspects of the nuances of strip search legality, but the overwhelming acceptance of the illegal nature of a "blanket strip search" in the absence of "reasonable belief" has been the cornerstone of our trained policy for over fifteen years. In an attempt to develop reasonable strip search policy, both the American Corrections Association and the American Jail Association have exposed hundreds of jails and thousands of their staff to contemporary training materials and instruments (such as the strip search decision-tree) intended to inform jails of the necessity to establish "reasonable belief" as the baseline of legal strip search policy. Several states (notably Texas and Kentucky) have incorporated our strip search decision-tree instrument as the baseline for establishing "reasonable belief" and justification for the conduct of a strip search; and, conversely the justification for why a strip search was not conducted. Individual jurisdictions (such as Jefferson County, Colorado) use the decision-tree as the basis for their search practices.

The entirety of our training career has been devoted to presenting seminars, writing articles (such as for the American Jail Association's *American Jails* magazine) and developing instruments to provide examples of the objective elements of "reasonable belief": felony violence, felony drug possession, dangerous contraband, offender demeanor, court appearances and custody status, exposure to contact with the public and other objective criteria. These materials and instruments have been provided in training seminars dealing with the classification of offenders, jail risk management and those seminars dealing directly with strip searches. Through classification training seminars presented on behalf of the American Jail Association and the National Institute of Corrections we have demonstrated the linkage between the identification of those offenders that present a risk to the public safety and the institutional safety and the development and implementation of an effective search policy establishing "reasonable belief" as a necessity for mitigating that risk. Through these seminars a concerted effort has been made to distribute the tools necessary for determining "reasonable belief".

"Reasonable belief" can be utilized as a mechanism to identify the potential "dangerousness" of offenders that are violent, prone to drug smuggling and use, or the manufacturing, of dangerous contraband thereby increasing the risk to all persons in the jail. "Reasonable belief" forms the basis for targeting those offenders that present the greatest threat to the institution and concentrates the focus of strip search resources on this group. The use of a broad-based policy of strip searching of all arrestees under the guise of a "visual observation" dilutes these same resources so that no one receives

a truly effective strip search, only a "visual observation". This was evidenced by some of the Officers claiming to have never conducted a strip search themselves. The outcome is that those that probably should have been strip searched were not and the vast majority of offenders that were not legally strip searchable were strip searched in violation of their 4th Amendment right. This contributes to the classification failures that result in an increased potential for violence, contraband, drug overdose deaths and self harm incidents to occur within these facilities.

**Summary**

It is my opinion, based upon my specialized training, background, experience, and education, as well as my continued research, writing, audits, training and continued work with jail facilities nationwide, and based upon my examination of the materials provided, that it is clearly evident from the policies, procedures and practices of both Burlington and Essex Counties that all arrestees are subjected to the same process of indiscriminate and illegal strip searches. Both Burlington and Essex Counties have failed in the past, and still continue to fall short, in sufficiently articulating those elements that the Courts have found to provide justification for the conduct of a legal strip search. As such, the practices used by Burlington and Essex Counties violated the 4th Amendment rights of Mr. Florence in his illegal strip search. These same Counties continue to violate the rights of those who have previously been strip searched and those who may be strip searched in the future.

This expert report is based upon the materials provided to date and is subject to amendment in the event additional material is produced.

This report is signed under penalty of perjury this 14th day of August, 2008.

Ray Sabbatine