FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

ALBERT W. FLORENCE           :

                                     :

          Plaintiff,          :      Hon. Joseph H. Rodriguez

                                     :

         v.                  :      Civil Action No. 05-3619

                                     :

BOARD OF CHOSEN            :         **OPINION**

FREEHOLDERS OF THE COUNTY  :

OF BURLINGTON, *et al.*,      :

                                     :

          Defendants.       :

_____:

Appearances:

*Attorney for Plaintiffs*:
Susan Chana Lask, Esq.
244 5th Ave.
Suite 2369
New York, NY 10001

*Attorney for Defendant Burlington*:    *Attorney for Defendant Essex*:
J. Brooks DiDonato, Esq.           Alan R. Ruddy, Esq.
Parker McCay                   Office of the Essex County Counsel
Three Greentree Center         Hall of Records
7001 Lincoln Dr. West           465 Dr. Martin Luther King Blvd.
P.O. Box 974                     Room 535
Marlton, NJ 08053             Newark, NJ 07012

**RODRIGUEZ**, Senior District Judge:

This matter comes before the Court on cross-motions for summary judgment

filed by Albert W. Florence ("Florence" or "Plaintiff") and Defendants.  Plaintiff

represents a class certified by this Court as:

> All arrestees charged with non-indictable offenses who were processed,
> housed or held-over at Defendant Burlington County Jail and/or Essex

County Correctional Facility from March 3, 2003 to the present date who were directed by Defendants' officers to strip naked before those officers, no matter if the officers term that procedure a "visual observation" or otherwise, without the officers first articulating a reasonable belief that those arrestees were concealing contraband, drugs or weapons.

Defendants named in the complaint are Board of Chosen Freeholders of the County of Burlington, Burlington County Jail ("Burlington Jail), Warden Juel Cole, Individually and Officially as Warden of Burlington County Jail, Essex County Correctional Facility ("Essex Jail"), Essex County Sheriff's Department and several John Does.

*Plaintiffs seek:*

1. Summary judgment on the issue of law regarding whether Defendants violated Plaintiffs' constitutional rights by their policy of strip searching non-indictable arrestees without reasonable suspicion;

2. Preliminary injunctive relief on behalf of the class against Defendants Burlington and Essex Counties' strip search policies.

*Defendants seek:*

1. Summary Judgment on the issue of law regarding whether the strip searches were constitutional;

2. Eleventh Amendment immunity for the Board of Chosen Freeholders of Burlington County, Warden Juel Cole in his official capacity, and Burlington County Jail;

3. Qualified Immunity for Warden Juel Cole in his individual capacity;

4. Dismissal of Count Five - § 1983 Municipality Custom Violations regarding Essex County.[1]

For the reasons expressed below, Plaintiffs' motions are granted in part and denied in

---

[1]    For whatever reason, there are two Count Fives in Plaintiffs' First Amended Complaint.  The 'Count Five' referred to in this Opinion should actually be Count Seven, if properly labeled in the First Amended Complaint.  (Am. Compl. at ¶¶ 80-88.)  For purposes of consistency, however, it remains as labeled–'Count Five.'

part.  Defendants' cross-motions for summary judgment are denied, and the claims for

Eleventh Amendment immunity and qualified immunity are also denied.  Defendant's

claim to dismiss the § 1983 Municipality Custom Violations Count is denied.

## I. JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 over Plaintiffs' 42 U.S.C. §

1983 claim for violation of their federal constitutional rights.

## II.  FACTUAL & PROCEDURAL BACKGROUND

### A.  *Facts Relating to Plaintiff's Arrest, Detention, and Alleged Strip Searches*

The parties are familiar with the facts of this case.  For purposes of summary

judgment, however, the facts shall be provided herein, in large measure undisturbed

from this Court's previous opinion certifying the class.  See Florence v. Bd. of Chosen

Freeholders, 2008 WL 800970, *1-*5 (D.N.J. March 20, 2008).

On March 3, 2005, Florence was a passenger in his sport utility vehicle, which

was being driven by his wife on Interstate Highway 295 in Burlington County.  (See Pl.'s

Statement of Undisputed Material Facts at ¶ 1.)  The vehicle was stopped by a New

Jersey State Trooper, who directed Florence to exit the vehicle.  (Id. at ¶ 2.)  Florence

was arrested based on an Essex County bench warrant that was issued on April 25,

2003.  (Id.)  Florence contends that the warrant charged him with a form of civil

contempt that is a non-indictable offense.  (Id. at ¶ 3.)  In fact, the warrant related to a

fine which Florence had already paid.  (Id.) Despite Florence's protests about the

warrant's validity, he was taken by the State Trooper to the Burlington Jail.  (Id. at ¶ 3.)

At the jail, Florence was subjected to what he alleges was a full strip and body

cavity search.[2]  (Id. at ¶ 3.)  According to his deposition testimony, an officer directed

him to remove all his clothing and, while nude, open his mouth, lift his tongue, hold his

arms out, turn fully around, and lift his genitals.  (Id.)  Florence complied with these

requests while the officer sat approximately one arm's length in front of him.  (Id. at ¶

4.)  The officer then instructed Florence to shower.  (Id.)  In the end, Florence was held

at the Burlington Jail for six days.  (Id.)

After the sixth day, the Essex County Sheriff's Department collected Florence and

transported him to the Essex Jail.  (Id. at ¶ 5.)  Upon his arrival, Florence was processed

and again subjected to what he alleges was a full strip and body cavity search.  (Id.)

According to Florence's deposition testimony, Essex Jail officers told him and four other

arrestees to enter separate shower stalls, strip all their clothing and shower.  (Id. at ¶ 6.)

Florence and the other arrestees complied by completely removing their clothes while

two officers watched.  (Id.)  Florence then showered, and was directed to open his mouth

and lift his genitals.  (Id.)  Next, he was ordered to turn around so that he faced away

from the officers, after which time he was told to squat and cough, and then turn back

around to face front.  (Id. at ¶ 7)  Following this episode, Florence was placed with the

general jail population until the next day when the charges against him were dismissed.

(Id.)

### B.  Evidence in the Record

The following subsections detail the intake procedures at Burlington and Essex,

---

[2]    While not binding on this Court, it is helpful to note that New Jersey law defines
a strip search as "the removal or rearrangement of clothing for the purpose of visual inspection
of the person's undergarments, buttocks, anus, genitals or breasts."  N.J. STAT. ANN. § 2A:161A-
3.

4

respectively.  Although the parties are familiar with this evidence, <u>see</u> <u>Florence</u>, <u>supra</u>, at

*1-*5, the Court reincorporates the pertinent details as they relate directly to the instant

cross-motions for summary judgment.

### 1. Burlington Jail's Procedures

Burlington Jail's intake procedures are based on the document—"Policies and

Procedures: Search of Inmates – No. Section 1186" (hereinafter "Section 1186").  (<u>See</u>

Pl.'s Statement of Undisputed Material Facts at ¶ 8.)  Section 1186 defines a strip search

as "a physical search of an inmate . . . while unclothed consisting of routine and

systematic visual observation of the inmate's physical body to look for distinguished

identifying marks, scars or deformities, signs of illness, injury or disease and/or the

concealment of contraband on the inmate's body."  (<u>Id.</u> at ¶ 9.)  The document also

provides that "[a] person who has been detained or arrested for commission of an

offense other than a crime[3] . . . shall not be subject to a strip-search unless there is a

reasonable suspicion that a weapon, controlled dangerous substance or contraband will

be found."  (<u>Id.</u> at ¶ 10.)

Several Burlington Jail officers and Warden Cole testified in depositions about

these procedures.  Lieutenant Douglas Chilton has worked for the Burlington Jail since

1997.  (<u>Id.</u> at ¶12.)  He executed a document related to Plaintiff's alleged strip search

entitled "Strip Search Authorization Form."  (<u>Id.</u>)  This form indicates that Plaintiff was

not strip searched, <u>per se</u>.  (<u>Id.</u>)  Lieutenant Chilton testified during his deposition that

arrestees who are brought in for non-indictable offenses are subjected to a "visual

---

[3]        New Jersey law provides no right to indictment by a grand jury for offenses other
than crimes.  <u>See</u> N.J. STAT. ANN. § 2C:1-4(b).  Such offenses are aptly dubbed "non-indictable."

5

observation," while those admitted for indictable offenses are strip searched.  (Id. at ¶ 13.)  He further testified that Plaintiff's Strip Search Authorization Form was marked "not strip searched" because he was admitted for a "failure to appear," which is a non-indictable offense, and which mandates only a visual observation during intake.  (Id.)

Officer Haywood Reeder has worked at the Burlington Jail since 1990.  (Id. at ¶ 14.)  He confirmed that arrestees admitted for non-indictable offenses, such as civil contempt, should not be strip searched.  (Id.)  Relatedly, he defined a strip search as searching various parts of a nude inmate's body for contraband, scars, marks, or tattoos. (Id. at ¶ 15.)  He also testified that all inmates are subjected to a visual observation irrespective of whether they are indictable or non-indictable.  (Id. at ¶ 16.)  According to Officer Reeder, a visual observation includes: (1) checking a nude arrestee for scars, marks, and tattoos while he strips for a mandatory shower; (2) instructing the nude arrestee on the application of a delousing agent; and (3) instructing the nude arrestee to change into jail clothing following his shower.  (Id. at ¶ 17.)

Officer Charles Palmer has worked for the Burlington Jail since 2000.  (Id. at ¶ 18.)  He also testified that arrestees admitted for non-indictable offenses are subjected to a visual observation.  (Id.)  Officer Palmer further testified that a visual observation involves taking an inmate into the shower area, having him remove all his clothing, directing him to turn around–while nude–so the officer can look for bruises and distinguishing marks, and then having the inmate take a shower.  (Id. at ¶ 19.) According to Officer Palmer, the difference between a visual observation and a strip search is that, with the latter, officers direct arrestees to spread their buttocks and/or lift their genitals.  (Id. at ¶ 20.)  However, he acknowledged that he has found genital

piercings and tattoos during visual observations, (id.), which suggests there is a cursory examination of genitalia during a visual observation.

Officer Sean Gallagher has worked for the Burlington Jail since 1996.  (Id. at ¶ 21.)  Similar to the other officers, he testified that non-indictable arrestees, such as those arrested for civil contempt, are subjected to a visual observation.  (Id.)  He further testified that a visual observation entails taking the arrestee to a shower room, having him remove his clothing and turn around while the officer looks at the arrestee's nude body to check for scars, marks, tattoos, and body vermin, before finally instructing the arrestee to shower with a delousing agent.  (Id. at ¶ 22.)  During these visual observations, Officer Gallagher directs inmates with hanging genitalia to lift their genitals in order to look for contraband, scars, marks, and tattoos.  (Id. at ¶ 23.)  When asked how this differed from a strip search, Officer Gallagher explained that strip searches are "a little more thorough," and involve having the inmate bend over and spread his buttocks so the officer can "get a view of their anus to see if there is anything that would be suspicious looking . . . ." (Id. at ¶ 24.)  In any event, Officer Gallagher acknowledged that all arrestees, whether indictable or non-indictable, are required to take off their clothing while the officer visually observes them and has them turn around.  (Id. at ¶ 25.)  According to Officer Gallagher, this procedure is required by the Burlington Jail's custom and practice, which every corrections officer follows.  (Id. at ¶ 26.)

Lieutenant Jerry Coleman has worked at the Burlington Jail since 1990.  (Id. at ¶ 27.)  He testified that arrestees who are not indictable are subjected to a visual observation as part of the intake process.  (Id.)  According to Lieutenant Coleman, a

visual observation involves an officer taking the arrestee to a shower room whereupon the arrestee removes his clothing and turns around so as to allow the officer to check the arrestee's front and back for deformities, bruises, marks, tattoos, and puncture wounds. (Id. at ¶ 28.)  Lieutenant Coleman also drew a distinction between a visual observation and a strip search, claiming that the latter requires arrestees to bend down, squat, and lift their genitals.  (Id. at ¶ 29.)

Lastly, Warden Juel Cole has worked at the Burlington Jail since 1976 and has been its warden since 1997.  (Id. at ¶ 30.)  Like the officers, Warden Cole confirmed that an arrestee admitted for a non-indictable offense is subjected to a visual observation, which involves an officer "mak[ing] a quick check" on a nude inmate while he changes clothing or during his shower for bruises, tattoos, or "any item like that of any importance."  (Id. at ¶ 31)  Sometimes, though apparently not always, the officer conducting the visual observation will direct the nude arrestee to turn around to facilitate a full check of the arrestee's entire body.  (Id. at ¶ 32.)  Warden Cole acknowledged that if he directed an inmate to remove his clothing, he would be telling the inmate to "strip".  (Id. at ¶ 33.)  However, according to Warden Cole, a visual observation of an arrestee's nude body does not constitute a "search" under the Burlington Jail's definition of that term.  (Cole Dep. 31:11-16, Nov. 30, 2006.)

## 2. *Essex County Correctional Facility's Procedures*

Essex Jail intake procedures during the relevant class period are based on two documents: (1) a document entitled "Department of Public Safety: General Order No. 89-17" (hereinafter "Order No. 89-17"); and (2) one called "Department of Corrections:

Administrative Directive No. 04-06" (hereinafter "Directive No. 04-06").[4]  (See Pl.'s
Statement of Undisputed Material Facts at ¶ 34.)  Order No. 89-17 went into effect in
September 2002 and provides that, upon arrival at the Essex Jail, all arrestees shall be
strip searched and then required to shower.  (Id. at ¶ 35.)  It further states that a strip
search is to consist of having an arrestee undress completely.  (Id. at ¶ 36.)  Officers are
supposed to "observe carefully while the inmate undresses."  (Id.)  Moreover, officers are
to examine the interior of the arrestee's mouth; his or her ears, nose, hair and scalp; his
or her fingers, hands, arms, and armpits; and all body openings and the inner thighs.
(Id. at ¶ 37.)

Order No. 89-17 was superceded in April 2005 by Directive No. 04-06.  The latter
document provides that officers are required to "[c]onduct a thorough search of
individual inmates[.]"  (Id. at ¶ 38.)  It further directs officers to have all arrestees
shower during intake.  (Id. at ¶ 39.)  Officers are required to "[o]bserve and document"
any evidence of body markings, vermin or disease, sores, wounds, and other injuries.
(Id. at ¶ 40.)  In contrast with Order No. 89-17, Directive No. 04-06 facially prohibits
strip searching non-indictable arrestees in the absence of reasonable suspicion that the
search will produce weapons, drugs, or contraband.  (Id. at ¶ 41.)

Essex Jail officers and Warden Glover testified about intake procedures at that
facility.  Sergeant Thomas Logue has worked for the Essex Jail since 2005, and was on
intake duty on March 9, 2005, the night Plaintiff was booked.  (Id. at ¶ 42.)  He testified

---

[4]      Order No. 89-17 and Directive No. 04-06 were attached as "Exhibit D" to an
August 2, 2007 certification made by Michael Calabro, co-counsel for Plaintiff.  These
submissions were initially provided by Defendant Essex as part of their discovery response.  (Pl.
Br. at 12.)  The Court cites Order No. 89-17 as Exhibit D(1) and Directive No. 04-06 as Exhibit
D(2).

that, for intake processing purposes, all arrestees are treated the same, without any distinction based on whether the arrestee is accused of an indictable or a non-indictable offense.  (Id. at ¶ 43.)  According to Sergeant Logue, officers call up to three arrestees at a time to enter the shower area during processing.  (Id.)  Once there, corrections officers direct the arrestees to remove their clothing and place them into gray bins.  (Id. at ¶ 44.) The arrestees then simultaneously undress while the officers view their nude bodies. (Id.)  Toward the end of his testimony, Sergeant Logue reiterated that the same intake procedures are conducted for all arrestees irrespective of the nature of the charged offence.  (Id. at ¶ 45.)

Officer Richard Monroig has worked at the Essex Jail since 1995.  (Id. at ¶ 46.) Like Sergeant Logue, Officer Monroig testified that arrestees are never segregated based on the nature of their offense–i.e., indictable versus non-indictable–during the intake process.  (Id.)  Officer Monroig candidly explained that processing officers are not even trained as to which charges are indictable and which are not indictable.  (Id. at ¶ 47.) According to Officer Monroig, as part of the intake process, arrestees are lead, three at a time, to a shower area where officers direct them to remove their clothing and shower. (Id. at ¶ 48.)  The arrestees then take their clothes off and stand nude while an officer watches.  (Id.)

Lieutenant Michael Salzano has worked for the Essex Jail since 1987.  (Id. at 49.) He works in the shower room daily and is very familiar with the Essex Jail's intake procedures.  (Id.)  These procedures include a mandatory shower.  (Id. at ¶ 49.) Consistent with the previous testimony, Lieutenant Salzano testified that officers bring up to three arrestees into the shower room at a time, and direct them to remove their

clothing and take a shower.  (<u>Id.</u> at ¶ 50.)  Lieutenant Salzano testified that this procedure is the same regardless of whether the arrestee is admitted for an indictable or non-indictable offense.  (<u>Id.</u> at ¶ 51.)

Lastly, Warden Larry Glover has been the warden at the Essex Jail since 2004. (<u>Id.</u> at 52.)  He testified that arrestees are searched to ensure they carry no contraband. (<u>Id.</u>)  This process includes having as many as three arrestees enter the shower area and remove their clothing, which officers proceed to search.  (<u>Id.</u> at ¶ 53.)  The arrestees shower shortly thereafter and then are directed to put on jail-issued clothing.  (<u>Id.</u> at ¶ 54.)

### C. Summary Judgment Cross-Motions

Plaintiffs move for summary judgment, claiming that the procedures described above amount to unconstitutional strip searches even if, in the case of Burlington Jail, the procedures are termed a "visual observation" or if, in the case of the Essex Jail, the written policy now facially complies with New Jersey's strip searching rules.  <u>See</u> <u>Florence</u>, <u>supra</u>, at *5.  Plaintiffs specifically allege that

> the undisputed facts establish that Defendants' policy of strip-searching all arrestees without individualized suspicion is a violation of clearly established constitutional law.

(Pl. Br. at 16.)  Plaintiffs further allege that Defendants "admit that every unnamed class member ... has been ordered" to completely disrobe and stand nude upon admission to the jail facilities, "without Defendants first articulating a reasonable basis to do so." (<u>Id.</u>)  Citing persuasive albeit non-binding case law, Plaintiffs contend that, at minimum, individualized reasonable suspicion for weapons, drugs, or other contraband must first exist before a jail official may strip search anyone charged with a non-indictable offense.

11

(Id. at 15.)  Because no reasonable suspicion existed before the instant searches took place, Plaintiffs maintain that the searches violated their Fourth Amendment rights. (Id.)  Plaintiffs consequently assert an action arising under 42 U.S.C. § 1983, claiming violation of their federal constitutional rights.  Plaintiffs seek preliminary injunctive relief against Burlington and Essex County Jails.[5]

Defendants Burlington and Essex answer in their cross-motions that the visual observations/strip search policies are constitutional, and they point to a recent trend in the Circuit Courts of Appeal to substantiate this claim.[6]  In doing so, Defendants ask this Court to revisit the holding of Davis v. City of Camden, 657 F. Supp. 396 (D.N.J. 1987), contending that it cannot withstand the "weight" of modern authority.  (See Def. Burlington Reply Br. at 16.)  Next, Defendants contend that the Board of Chosen Freeholders of Burlington County, Warden Cole in his official capacity, and Burlington County Jail are entitled to immunity as arms of the State of New Jersey pursuant to the Eleventh Amendment.  Defendant Warden Cole in his individual capacity contends that he is entitled to qualified immunity, thereby barring money damages against him. Finally, Defendant Essex seeks dismissal of the § 1983 arrest claim by Plaintiff, contending it is invalid.  These claims are discussed in turn.

---

[5]   In their brief, Plaintiffs also passingly ask this Court for counsel fees.  (See Pl. Br. at 2 ("Plaintiff requests counsel fees."))  This Court notes that, pursuant to 42 U.S.C. § 1988(b), a "prevailing party" in a § 1983 action is entitled to "reasonable" counsel fees.  See Hensley v. Eckerhart, 461 U.S. 424, 433 (1983).  Yet, consistent with Federal Rule of Civil Procedure 23(h), a request for counsel or attorney's fees must be made by motion and "must be filed no later than 14 days after the entry of judgment."  See Fed. R. Civ. P. 54(d)(2)(A) - (B).  As such, Plaintiffs' request shall not be addressed at this time.

[6]   While eight circuits have addressed the issue at bar, the Third Circuit has yet to provide this Court with controlling authority.

# III. DISCUSSION

## A. Summary Judgment Standard

Summary judgment shall be granted "if there is no genuine issue of material fact and if, viewing the facts in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law."  See Pearson v. Component Tech. Corp., 247 F.3d 471, 482 n.1 (3d Cir. 2001) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)); accord Fed. R. Civ. P. 56(c).  This Court will enter summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  See Fed. R. Civ. P. 56(c).

An issue is "genuine" if it is supported by such evidence that a reasonable jury could return a verdict in the nonmoving party's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  In determining whether a genuine issue of material fact exists, the court must view the facts and all reasonable inferences drawn from those facts in the light most favorable to the nonmoving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Initially, the moving party has the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial.  Id.; see also

13

Maidenbaum v. Bally's Park Place, Inc., 870 F. Supp. 1254, 1258 (D.N.J. 1994). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. Andersen, 477 U.S. at 256-57. "A nonmoving party may not 'rest upon mere allegations, general denials or … vague statements … ' " See Trap Rock Indus., Inc. v. Local 825, Int'l Union of Operating Eng'rs, 982 F.2d 884, 890 (3d Cir. 1992) (quoting Quiroga v. Hasbro, Inc., 934 F.2d 497, 500 (3d Cir. 1991))

In deciding the merits of a party's motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Credibility determinations are the province of the finder of fact. See Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992). If there is no genuine issue of material fact upon review of cross-motions for summary judgment, then judgment may be entered in favor of the deserving party in light of the law and undisputed facts. See Iberia Foods Corp. v. Romeo Jr., 150 F.3d 298, 302 (3d Cir. 1998) (citing Ciarlante v. Brown & Williamson Tobacco Corp., 143 F.3d 139, 145-46 (3d Cir. 1998)).

### B. Analysis

In the instant case, the first issue is whether the intake procedures of Burlington and Essex County are so intrusive that they rise to the level of "strip search". Assuming they do, and there is no genuine issue of material fact to dispute, then the question of the constitutionality of the searches, performed without reasonable suspicion, must be addressed. On this latter issue, a circuit split has recently developed.

14

### 1. The Nature of the Burlington and Essex Intake Procedures

Dealing first with Burlington County, there is no genuine issue of material fact as to whether the "visual observations" constitute a search under the Fourth Amendment. Each officer who testified admitted that everyone who enters the Burlington County Jail is subject to a visual observation, regardless of whether that person is an indictable or non-indictable offender.   This blanket policy entails a complete disrobing, followed by an examination of the nude inmate for bruises, marks, wounds or other distinguishing features by the supervising officer, which is then followed by a supervised shower with a delousing agent.

According to Burlington officers, the only distinction between a "strip search" and a "visual observation" is the thoroughness of the search.  (See Pl.'s Statement of Undisputed Material Facts at ¶ 24.)  Thus, whereas a strip search involves squatting, bending one's buttocks, and in the case of male inmates–lifting one's genitalia, (see id. at ¶ 20), a visual observation involves the slightly less intrusive procedure described above.  There is one discrepancy in the record, however.  According to Officer Gallagher, male inmates during visual observations are directed to lift their genitals.  (Id. at ¶ 23.) To him, a strip search is more thorough because of its attendant anal cavity inspection. (Id. at ¶ 24.)  The other Burlington officers who distinguish a strip search from a visual observation testified that a genital lift is done only in the case of a strip search.  (See, e.g., Pl.'s Statement of Undisputed Material Facts at ¶¶ 17-20, 29.)

Whatever the case may be, a discrepancy of this sort does not necessarily provide a genuine issue of material fact.  At oral argument, counsel for Plaintiff remarked– "It's just common sense.  Take off all your clothes.  You're stripped searched.  A visual

observation is a matter of semantics." (Oral Arg. Tr., 13:6-9, Nov. 10, 2008.) Even if Warden Cole maintains that the visual observation of an incoming inmate does not constitute a search under the jail's definition of the word, (Cole Dep. at 31:11-16), that definition is of no consequence here. A visual observation is a search as defined by the Fourth Amendment. See Johnson v. Phelan, 69 F.3d 144, 145 (7th Cir. 1995) (noting that "observation is a form of search."). Whether it is called a 'strip search' or a 'visual observation'–the distinction going only to the intrusiveness of the search–it is still a *search* for purposes of Fourth Amendment analysis. See, e.g., Stanley v. Henson, 337 F.3d 961, 964 n. 2 (7th Cir. 2003). The only question then, is whether the searches of non-indictable offenders are unreasonable when conducted pursuant to a blanket policy without reasonable suspicion. See infra Part III.B.2.

As for Essex, there is no attempt to distinguish between a 'visual observation' and a 'strip search'. When Plaintiff was arrested on March 3, 2005, Order No. 89-17 was in effect.[7] (Pl.'s Statement of Undisputed Material Fact at ¶¶ 35-38.) That order required all incoming arrestees to be strip searched. (Id. at ¶ 35.) Like Burlington, inmates were instructed to take a supervised shower. (Id. at ¶¶ 35–37.) Also like Burlington, inmates were not segregated on the basis of indictable versus non-indictable offense. (Id. at ¶ 43.) The only difference between the two counties' procedures was the extent of the search. Essex officers carefully observed the entire naked body of the inmate, including body openings and inner thighs. (Id. at ¶ 37.) If the less-intrusive Burlington procedure

---

[7]     As stated above, Order No. 89-17 was superceded by Directive No. 04-06 in April 2005, which facially prohibits the strip searching of non-indictable arrestees in the absence of reasonable suspicion of weapons, drugs, or contraband. (Calabro Cert., 8/2/2007, Ex. D(1), p.3, § VII.c.8.) For discussion of the relevance of Directive No. 04-06, see infra Part III.3.

16

constitutes a search for purposes of the Fourth Amendment, it follows that the more-intrusive Essex procedure also constitutes a search.

Defendant Essex County curiously contends that because its witnesses denied "that there was a custom or policy of strip-searching ... the alleged class in the case at bar", summary judgment should not be granted.  (Def. Essex Br. at 26-27.)  Essex further contends that, as a result, "Plaintiff has failed to establish a <u>Monell</u> violation."[8] (Def. Essex Br. at 25.)  Not advancing these claims pursuant to any Federal Rule of Civil Procedure, Essex seemingly argues that because Plaintiffs cannot establish a custom or policy on behalf of Essex County, (<u>id.</u>), summary judgment in favor of Plaintiffs should not be granted.  Essex apparently seeks to raise a question of fact as to whether the strip searches even occurred.  Plaintiffs quickly respond by citing the formal strip search policy in place from 2002 until 2005, entitled "Directive 89-17", <u>see</u> <u>supra</u>.  (Pl. Opp'n Br. at 7.)  That policy mandated that every person shall be strip searched upon intake. (<u>Id.</u>)  In light of that policy, there is no genuine issue of material fact to prevent summary judgment in favor of Plaintiffs.  Once again, the only question is whether the search procedure of non-indictable offenders is unreasonable when it is performed pursuant to a blanket policy without reasonable suspicion.

### 2. Constitutionality of the Intake Procedures

---

[8]    <u>Monell v. New York City Dept. Of Soc. Services</u> holds that "local governing bodies ... can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where ... the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." <u>See</u> 436 U.S. 658, 690 (1978) .

The Supreme Court applied a Fourth Amendment[9] analytical framework to the body searches of pre-trial detainees in the landmark case of Bell v. Wolfish, 441 U.S. 521, 559 (1979).  In that case, a federal short-term custodial facility required pre-trial detainees to strip after each contact visit from an outside visitor.  Id. at 558.  The strip search enabled the officers to conduct a visual cavity inspection.  Id.  Detection and deterrence of drugs, weapons, or other contraband was the stated goal of the correctional facility in conducting the strip searches.  Id.  The question before the Supreme Court was "whether visual body-cavity inspections as contemplated by the ... rules can *ever be conducted on less than probable cause*."  Id. at 560 (alteration to original) (emphasis added).

The Court began its analysis by assuming that "convicted prisoners and pretrial detainees[] retain some Fourth Amendment rights upon commitment to a corrections facility..."  Id. at 558.  The Court then outlined a four-prong test to balance "the need for the particular search against the invasion of personal rights that the search entails."  Id.  Specifically, the Supreme Court opined:

> Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

_____

[9]     The Fourth Amendment provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probably cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

U.S. CONST. amend. IV.

Id. at 559.  Applying the balancing test to the facts of that case,[10] the Supreme Court held

that the searches did not offend the Fourth Amendment.  Id. at 558 ("The Fourth

Amendment prohibits only unreasonable searches, and under the circumstances, we do

not believe that these searches are unreasonable.") (internal citations omitted).  The

Court further held that the correctional facility could conduct such searches on *less than*

*probable cause*.  Id. at 560.  This holding resulted from a careful balancing of the

"significant and legitimate interests of the institution against the privacy interests of the

inmates..."  Id.

In the thirty years since Bell, the issue left ostensibly open for the lower courts is

whether reasonable suspicion is a minimal-threshold requirement for strip searches of

incoming inmates or pretrial detainees.  That issue was not addressed by the Supreme

Court in Bell, which dealt only with contact visits from outside visitors.  Since that time,

however, nine Circuit Courts of Appeal and several District Courts have addressed the

issue.  These decisions provide useful guidance for the Court.

### *i. Bell Progeny*

A district court in New Jersey first required reasonable suspicion to strip search

inmates in Davis v. City of Camden, 657 F. Supp. 396, 401 (D.N.J. 1987) (holding that a

plaintiff's Fourth Amendment rights were violated when she was strip searched without

reasonable suspicion, as part of a blanket policy applied by a jail).  In that case, the

plaintiff accompanied police officers to the station house to lodge a formal complaint

---

[10]     Inmates at the prison facilities were required to expose their body cavities for
visual inspection as part of a strip search performed after each contact visit with a person from
outside the facility.  Bell, 441 U.S. at 558.  The jail administrators justified the practice on the
bases of discovery and deterrence of "weapons, drugs, and other contraband."  Id.

against her neighbor.  Id. at 398.  For whatever reason, the police ran a computer check

on the plaintiff, which indicated several outstanding warrants for parking ticket

violations, in addition to an assault and battery charge which had been issued some four

years prior to the date of the computer check.  Id.  The plaintiff was arrested, and

thereafter strip searched upon her arrival at the county jail.[11]  Id.  The officers conceded

that reasonable suspicion for contraband was not present; instead they justified the

search pursuant to N.J. ADMIN. CODE 10A:31-3.12(2) (1979).[12]  Id. at 399.

Addressing the constitutionality of the search, the Honorable Mitchell H. Cohen

underscored the then-unanimous Circuit Courts of Appeal, and held that "there must be

a 'reasonable suspicion' that an arrestee is concealing weapons or contraband in order

for a strip search to be constitutionally justified."  Id. at 399.  Judge Cohen specifically

cited the reasoning of the Second Circuit, recognizing that:

> reasonable suspicion that a particular arrestee is concealing weapons or
> contraband can arise, not only from the specific circumstances relating to the
> arrestee or the arrest, but also from the nature of the charged offense.

Id. at 400 (citing Weber v. Dell, 804 F.2d 796, 800 (2d Cir. 1986)).  Thus, the Court

reasoned that a policy that mandates strip searches for all individuals charged with

felonies or drug-related/weapons-related misdemeanor offenses may be upheld because

---

[11]     Specifically, the plaintiff in Davis was told to remove all of her clothes and squat,
so the female jail matron could conduct a visual inspection of her orifices.  Davis, supra, at 398.

[12]     That Administrative Code provision provided in relevant part:

> All newly admitted inmates shall be thoroughly searched.  Each newly admitted
> inmate shall be strip searched for weapons and contraband.  This search also shall
> include a check for body vermin, cuts, bruises, needle scars, and other injuries.

N.J. ADMIN. CODE 10A:31-3.12(2) (1979).

such policy contains an implicit recognition of reasonable suspicion, albeit a general one. <u>See</u> <u>Davis</u>, 657 F. Supp at 400-401. The policy at issue in <u>Davis</u>, however, did not so limit the search to drug-related or weapons-related offenses. Rather, it mandated strip searches for "[a]ll newly admitted inmates…"[13] <u>Davis</u>, <u>supra</u>, at 398 n. 2 (citing N.J. ADMIN. CODE 10A:31-3.12(2) (1979)). Because the policy did not incorporate the reasonable suspicion requirement, it was ruled unconstitutional. <u>Id.</u> at 401.

Several other Courts in this District have since held the same. <u>See</u>, <u>e.g.</u>, <u>DiLoreto v. Borough of Oaklyn</u>, 744 F. Supp. 610, 622 (D.N.J. 1990) (holding that a visual strip search and subsequent viewing of plaintiff urinating was not reasonable "on the basis of mere suspicion that a car in which the detainee was a passenger was stolen."); <u>Ernst v. Borough of Fort Lee</u>, 739 F. Supp. 220, 225 (D.N.J. 1990) ("The mere fact that an arrestee will be incarcerated … does not render a strip search reasonable. Stated somewhat differently, arrest itself, standing alone, is simply not enough."); <u>O'Brien v. Borough of Woodbury Heights</u>, 679 F. Supp. 429, 434 (D.N.J. 1988) (holding that

---

[13]     Judge Cohen opined:

As this court sees it, a blanket policy covering *only* persons charged with felonies or with misdemeanors involving weapons or contraband arguably is justifiable because it is based on a reasonable generalization: that persons charged with these offenses are likely to be concealing weapons or contraband. Although such a blanket policy, by its very nature, may encompass some individual arrestees with respect to whom reasonable suspicion to search will not exist, such searches will nonetheless be upheld because the *policy* is deemed to be constitutionally justified. However, when an arrestee charged with a felony or a misdemeanor involving weapons or contraband is strip searched pursuant to a policy encompassing *all* arrestees, regardless of the nature of their offenses, and where it is conceded that no suspicion regarding the particular arrestee existed, the requisite justification for the search is lacking; neither the general policy nor its particular application is supportable.

<u>Id.</u>

strip/body cavity searches of plaintiffs arrested for petty disorderly offenses were unconstitutional and "senseless"); cf. Wilkes v. Borough of Clayton, 696 F. Supp. 144, 149 (D.N.J. 1988) (holding borough's blanket policy of visual observation of arrestees using bathroom facilities "no less destructive of arrestees' rights than the visual strip searches" previously held unconstitutional).

        With respect to the Circuit Courts of Appeal, eight circuits presently agree that reasonable suspicion must be present before a strip search is conducted in this context. See Bull v. City and County of San Francisco, 539 F.3d 1193 (9th Cir. 2008); Roberts v. Rhode Island., 239 F.3d 107 (1st Cir. 2001); Weber v. Dell, 804 F.2d 796 (2d Cir. 1986), cert denied, 483 U.S. 1020 (1987); Masters v. Crouch, 872 F.2d 1248, 1255 (6th Cir. 1989), cert denied, 493 U.S. 977 (1989); Jones v. Edwards, 770 F.2d 739 (8th Cir. 1985); Stewart v. County of Lubbock, 767 F.2d 153 (5th Cir. 1985), cert denied, 475 U.S. 1066 (1986); Hill v. Bogans, 735 F.2d 391 (10th Cir. 1984); Mary Beth G. v. City of Chicago, 723 F.2d 1263 (7th Cir. 1983); Logan v. Shealy, 660 F.2d 1007 (4th Cir. 1981), cert denied, 455 U.S. 942 (1982). This consensus is buttressed by valid concerns for privacy, dignity, and the preservation of self-worth. See, e.g., Roberts, 239 F.3d at 110 (considering strip searches an "extreme intrusion" on personal privacy and "an offense to the dignity of the individual") (citation omitted); Chapman v. Nichols, 989 F.3d 393, 396 (10th Cir. 1993) ("It is axiomatic that a strip search represents a serious intrusion upon personal rights."); Mary Beth G., 723 F.2d at 1272 (7th Cir. 1983) (considering strip searches "demeaning, dehumanizing, undignified, embarrassing and repulsive"); see also, O'Brien, 679 F. Supp. at 434 (D.N.J. 1988) (describing strip/body cavity searches of plaintiffs for disorderly offenses as humiliat[ing] and degrad[ing]"). In

short, a clear consensus demonstrates that these searches are undignified and unconstitutional.

Defendants disagree and contend that "[t]he weight of current authority nationwide as to the legality of blanket strip searches in prisons has turned overwhelmingly in favor of upholding such searches." (Def.'s Burlington Reply Br. at 2.) In light of this "overwhelming" authority, Defendants contend that "Davis misinterpreted the Supreme Court's ruling in Bell v. Wolfish, and this court should not adhere to its result." (Id.) (internal citation omitted). Defendants are correct that a circuit split has developed, but it is an overstatement to say that "current authority" has "turned overwhelmingly".

### ii. Competing Authority

There are three cases that indicate a new trend. First, the Seventh Circuit recently upheld a clothing-exchange procedure that requires inmates to disrobe in front of same-sex officers and put on jail-issued uniforms. See Stanley v. Henson, 337 F.3d 961, 966-67 (7th Cir. 2003).[14] Second, the Ninth Circuit's recent holding in Bull v. City and County of S.F., see supra, can be attributed to Circuit Judge Ikuta, who concurred only because he felt "compelled by Ninth Circuit case law." See Bull, 539 F.3d at 1202. In his concurrence, he opined that the Ninth Circuit misconstrued Bell v. Wolfish. Id. at 1202-05. Third, and most significantly, the Eleventh Circuit recently overruled its precedent that previously required reasonable suspicion for strip searches. See generally, Powell v. Barrett, 541 F.3d 1298 (11th Cir. 2008) (en banc). There, the *en*

---

[14] Defendants do not cite Stanley in their briefs, but it is relevant to the instant matter.

*banc* Court held that so long as the strip search is no more intrusive than the one conducted in Bell, then reasonable suspicion is not required for the search of an incoming inmate, regardless of whether the underlying arrest is for a misdemeanor or a felony. Id. at 1314. These new cases do not present controlling authority, but neither do the cases cited from different courts sitting in this District. As a result, this Court shall examine the cases to determine whether there are new reasons to depart from Davis.

Beginning with Stanley, the plaintiff in that case was arrested for misdemeanor charges of resisting arrest and battery on a police officer. Stanley, 337 F.3d at 962. At the police station, she was told to remove all her clothes except her underpants, and to put on a jail-issued uniform. Id. This process occurred in an open, albeit small room, with an officer watching. Id. During the two-minute procedure, the officer did not conduct a visual inspection of the plaintiff's orifices, nor did she touch the plaintiff in any way. Id.

After her charges were dropped, the plaintiff in Stanley filed a § 1983 claim alleging the clothing-exchange procedure violated her Fourth Amendment rights. Id. at 962-63. Specifically, she contended that the procedure amounted to an "intrusive strip search" performed "without regard" to her particular charge. Id. The Seventh Circuit began its analysis by concluding that, at minimum, a search had occurred:

> The presence of a jail officer who continuously observed Ms. Stanley as she exchanged her clothing ... suggests that this was more than an administrative procedure for changing into a jail uniform; it implies that the officer's purpose was to watch over Ms. Stanley to ensure that nothing illicit was brought into or out of the jail.

Id. at 964. The Seventh Circuit rightfully held that "observation" is a form of search for purposes of the Fourth Amendment. Id. The Circuit then performed the Bell balancing

test, ultimately concluding that the procedure did not offend the Fourth Amendment. Stanley, 337 F.3d at 967.  The scope of the intrusion was relatively narrow in light of the "objective of preventing the smuggling of weapons or other contraband into ... the jail population." Id. at 966.

Stanley demonstrates that a search procedure justified on the basis of jail security may be upheld if it is minimally intrusive and by consequence, respectful of privacy and human dignity.  Such a procedure is not only consistent with the Fourth Amendment, it is also consistent with the policy concerns of jail officials.  While the purpose of the search was similar to the instant case, the means to serve that purpose were decidedly less intrusive.  For example, there the underpants remain on at all times, and no one is forced to undergo a supervised shower.

Next, Defendants point to the recent Ninth Circuit decision in Bull to lend support to their position that strip searches done without reasonable suspicion are constitutional.[15]  (See Oral Arg. Tr. at 30-31, Nov. 10, 2008.)  Even though that case held in concert with the majority of circuits opposing such searches, Defendants point to the concurring opinion of Circuit Judge Ikuta.  He opined, "I concur in the majority's opinion with reluctance and grave concern.  While compelled by Ninth Circuit case law, the disposition is in tension with Supreme Court precedent." Bull, 539 F.3d at 1202 (Ikuta, J., concurring).

In his view, Ninth Circuit jurisprudence places undue reliance on evidence of a smuggling problem when deciding the reasonableness of a strip-search procedure.  This

---

[15]     The strip search in that case "involved inspection of the naked body, including the arrestee's breasts, buttocks, and genitalia." Bull, supra, at 1195.

reliance, he writes, is contrary to the dictates of <u>Bell</u>.  <u>Id.</u> at 1203.  In <u>Bell</u>, the administrators had "proved only one instance in the [detention facility's] short history where contraband was found during a body cavity search."  <u>Id.</u> (quoting <u>Bell</u>, <u>supra</u>, at 558).  The Supreme Court nevertheless upheld the blanket strip search procedure, and stated that "the lack of evidence was of *little import*."  <u>Id.</u> (citing <u>Bell</u>, <u>supra</u>, at 559) (emphasis added).  In short, Judge Ikuta's concern was that the Ninth Circuit adopted the very standard that the Supreme Court rejected in <u>Bell</u>.

While Judge Ikuta's concurrence provides guidance with respect to the <u>Bell</u> balancing test, it does not change the fact that the Ninth Circuit struck down a strip search procedure, similar to the one here, as unconstitutional.  That holding lends further support to Plaintiff's claim, and does little to advance the cause of Defendants.

Defendants next cite <u>Powell v. Barrett</u>, 541 F.3d 1298 (11th Cir. 2008) (en banc).[16] Due to the heavy reliance on this case, a thorough examination is required.  (<u>See</u> Oral Arg. Tr. at 21:9-12, Nov. 10, 2008.) ("I could not state better than the Eleventh Circuit ... I believe that the Eleventh Circuit interpretation of <u>Bell</u> is exactly correct.").

<u>Powell</u> represents the first clear break with the holding of the majority of Circuits, effectively creating a Circuit split.  The issue before the *en banc* Circuit was:

> whether a policy or practice of strip searching all arrestees as part of a process of booking them into a general population of a detention facility, even without reasonable suspicion to believe that they may be concealing contraband, is constitutionally permissible.

---

[16]     The booking procedures at issue in <u>Powell</u> are somewhat similar to the ones in the present case.  For example, in that case, the inmates also took a group shower while being observed by jail officials. <u>Powell</u>, 541 F.3d at 1301.  The major difference is the number; whereas here, Essex County compelled showers of up to three inmates at a time, in <u>Powell</u>, up to forty inmates showered together in a large room.  <u>Id.</u>

Id. at 1300.  Answering in the affirmative, the Eleventh Circuit not only overruled its

own precedent, it also rejected the persuasive precedent of several circuits that

distinguish misdemeanor-booking procedure from that of felony.  See id. at 1309

(acknowledging that some circuits require reasonable suspicion to strip search persons

charged with misdemeanor offenses, unlike felony offenses, where no level of suspicion

is required).  Citing a string of cases holding to that effect from the Sixth, Fifth, Ninth,

and Seventh Circuits,[17] the Eleventh Circuit states bluntly– "[t]hose decisions are

wrong."  Id. at 1310.

Before fully examining the Circuit's view of the misdemeanor/felony distinction,

it is important to first examine the reasoning behind the Eleventh Circuit's principle

holding.  The Eleventh Circuit states:

> The security needs that the Court in Bell found to justify strip searching an
> inmate re-entering the jail population after a contact visit are no greater than
> those that justify searching an arrestee when he is booked into the general
> population for the first time.

Powell, 541 F.3d at 1302.  Thus, the Circuit based its holding in part on an analogy

between an incoming inmate and an admitted inmate, after a contact visit; the former is

different, it reasoned, only because his 'contact' with the outside lasted his entire pre-

arrest life.  Id. at 1313.  By implication, if a contact visit for an *admitted* inmate provides

an opportunity to smuggle contraband, then surely "one big and prolonged contact visit

with the outside world", see id., for an *incoming* inmate provides an even a greater

---

[17]    See, e.g., Masters v. Crouch, 872 F.2d 1248, 1255 (6th Cir. 1989); Stewart v.
Lubbock County, Tex., 767 F.2d 153, 156-57 (5th Cir. 1985); Giles v. Ackerman, 746 F.2d 614,
617 (9th Cir. 1984); overruled on other grounds by Hodgers-Durgin v. de la Vina, 199 F.3d 1037,
1041 n.1 (9th Cir. 1999) (en banc); Mary Beth G. v. City of Chicago, 723 F.2d 1263, 1272 (7th Cir.
1983).  This District makes a similar distinction between indictable and non-indictable offenses.
See, e.g., Ernst, 739 F. Supp. at 225.

opportunity to smuggle contraband.  Although logically sound, this argument discounts the fact that, by and large, most arrests are a surprise to the arrestee.  Such a surprise does not give the arrestee an opportunity to plan a smuggling enterprise, unlike an admitted inmate who has knowledge of a forthcoming contact visit.

The Circuit also bases its holding on the contention that the officers in Bell did not have reasonable suspicion prior to conducting the blanket policy searches.  See Powell, supra, at 1307 ("When the [Supreme] [C]ourt stated that 'these searches' do not violate the Fourth Amendment, it obviously meant the searches that were before it, and those searches were conducted under a blanket policy without reasonable suspicion.").  Yet, just because the searches in Bell were conducted pursuant to a blanket policy does not mean that reasonable suspicion was lacking.  The searches in Bell were conducted after contact visits with outside visitors, during which time exposure to contraband is heightened.  Cf. Shain v. Ellison, 273 F.3d 56, 64 (2d Cir. 2001) (noting that "contraband is often passed" during contact visits).  These visits, by their very nature, may then provide the requisite reasonable suspicion for jail officers to justify the blanket search policy.  Such searches are consistent with the reasonable blanket-risk-assessment approach discussed in Davis and adopted by the several circuits that distinguish between misdemeanor and felony offenses.  See Davis, 657 F. Supp. at 400-01.  The mere fact that strip searches were conducted after contact visits pursuant to a blanket policy does not, by necessity, eradicate any reasonable suspicion used to justify them. Individualized reasonable suspicion may be lacking, but given the safety concerns of housing an admitted inmate in a detention setting, such a policy may nonetheless be constitutional if supported by the Bell balancing test.

28

One final aspect of the Eleventh Circuit's reasoning is worth noting.  The Circuit disagrees with its sister circuits' interpretation of the phrase, "less than probable cause." See id. at 1307.  It states:

> The Bell decision, correctly read, is inconsistent with the conclusion that the Fourth Amendment requires reasonable suspicion before an inmate entering or re-entering a detention facility may be subjected to a strip search that includes a body cavity inspection.

Id.  To support this conclusion, the Circuit states that the Supreme Court did not expressly require reasonable suspicion in Bell; it only held that strip searches could be conducted on "less than probable cause."  Id. at 1309 (citing Bell, 441 U.S. at 560).  The Circuit then reasons that "the absence of reasonable suspicion is also less than probable cause."  Id.  To be sure, this proposition is technically correct.  In support, the Circuit cites Justice Powell's opinion in Bell calling for "at least some level of cause, such as reasonable suspicion..." Id. (citing Bell, 441 U.S. at 563 (Powell, J., concurring in part and dissenting in part).  The Circuit subsequently concludes: "Obviously, Justice Powell would not have dissented from a holding that the Court had not made."

To begin, the conclusion that *'less than probable cause'* implicitly means '*no reasonable suspicion*' is too great of a logical leap without any more direction than a four-line concurrence and dissent by Justice Powell.  While it may be true that Justice Powell "would not have dissented from a holding that the Court had not made," other reasons for the dissent are equally plausible.  For example, Justice Powell may have dissented out of protest, assuming that the Justices failed to obtain enough votes to make a positive ruling on the issue.  Rather than forfeit an entire holding, the majority Court may have deemed it prudent to leave the interpretation of the phrase "less than

probable cause" to the lower courts.[18]  Still even more plausible, the Court may have
refrained from making a positive ruling on the issue simply because the particular
question of reasonable suspicion was not before the Court.  See, e.g., Harmon v.
Brucker, 355 U.S. 579, 581 (1958) (recognizing the "duty to avoid deciding constitutional
questions presented unless essential to a proper disposition of a case...").  Speculation of
this sort is justified only to show that there is more than one way to explain Justice
Powell's four-line dissent.  In any event, this interpretive approach rests on tenuous
ground.  Even the majority in Powell acknowledges that "it can be risky to place too
much reliance on dissenting opinions..."  Powell, 541 F.3d at 1308; see also Powell, 541
F.3d at 1314 (Edmondson, J., concurring) ("I think it is jurisprudentially unsound to
look at a Justice's dissenting opinion to determine what the Supreme Court has decided
in a case.").

The only remaining issue is the misdemeanor/felony distinction.  The Eleventh
Circuit correctly states that the misdemeanor/felony distinction finds no basis in the
Bell decision, as the Supreme Court in that case dealt with a blanket-policy covering all
inmates at the detention facility.  Id.  Some of those inmates were held for "contempt of
court", still others included "witnesses in protective custody who had not been accused
of doing anything wrong".  The point being that these are not persons one might
ordinarily suspect of smuggling contraband.  Id. (citing Bell, supra, at 524 & n. 3).  But

---

[18]      Notably, for thirty years the Supreme Court has not found a need to readdress
this issue, even in the face of eight circuits requiring reasonable suspicion to strip search
incoming prisoners or detainees.  See supra, p. 21-22 of this Opinion.  While "the denial of *a*
writ of certiorari imports no expression of opinion upon the merits of the case," see Missouri v.
Jenkins, 515 U.S. 70, 85 (1985) (emphasis added), the denial of *many a* writ over an extended
period of time speaks, at minimum, to a lack of urgency to address these holdings.

even if that policy made no distinction between misdemeanor and felony offenders, the persons strip searched pursuant to the policy were admitted inmates exposed to outside individuals via planned contact visits.  That situation is quite different from the instant matter.  Here, individuals are strip searched as they first enter the facility, without consideration of the crimes or offenses for which they are charged.  For reasons already stated, see p. 28 of this Opinion, the situations are inapposite.

Aside from the asserted lack of foundation in case law, the Eleventh Circuit further states that the distinction has "no constitutional significance when it comes to detention facility strip searches."  Id.  As a textual matter, the Fourth Amendment affords no more protections to persons charged with misdemeanors than it does to those charged with felonies.  Nevertheless, Fourth Amendment history and jurisprudence requires a careful balancing between the instant concerns of personal privacy and administration of security.  See Bell, supra, at 559.  After performing this balancing test, ever mindful that the Fourth Amendment prohibits "unreasonable" searches, four circuits have concluded that a distinction between misdemeanor or non-indictable offenses and felony or indictable offenses is appropriate.  See, e.g., Hartline v. Gallo, 546 F.3d 95, 102 (2d Cir. 2008) ("[F]or more than twenty years this Court has held that a misdemeanor arrestee may not be strip searched in the absence of individualized reasonable suspicion that she is secreting contraband.")  Indeed, this Court noted in its Opinion certifying the instant class that a similar distinction is recognized in this district.  Florence, supra, at *16 ("Davis requires strip searches to be based on reasonable suspicion ... which can be supplied by specific facts known about the arrestee or the arrest, *or the nature of the charged arrest*.") (citing Davis, supra, at 399-400)

(emphasis added); see also O'Brien, 679 F. Supp. at 434 (holding that strip/body cavity searches of plaintiffs arrested for petty disorderly offenses were unconstitutional and "senseless").  The courts that have required individualized reasonable suspicion prior to a strip search of misdemeanor or non-indictable arrestees have done so not because the Fourth Amendment textually grants such arrestees special protection; rather, courts have done so after analyzing valid concerns of personal privacy and security, adhering all the while to the Bell balancing test outlined by the Supreme Court.  The Eleventh Circuit disregards this fact by ruling the misdemeanor/felony distinction meaningless.

Ultimately, Powell is persuasive due to its novel reasoning and sheer *en banc* force.  Nevertheless, this Court ultimately finds its contrarian holding less than compelling.  The post-contact visit searches upheld in Bell are dissimilar to the post-intake searches struck down by the circuits in the thirty years since that decision.  Thus, Powell does not present a convincing argument to depart from Davis.

### iii. Burlington and Essex Counties

The search procedures at Burlington and Essex County jails do not pass constitutional muster under the Bell balancing test.  Furthermore, the Bell progeny supports the holding that strip searches of non-indictable offenders performed without reasonable suspicion violates the Fourth Amendment (made applicable to the states through the Fourteenth Amendment).  Although the scope of the particular intrusion at Burlington may be less intrusive than the one in place at Essex, both procedures involve a complete disrobing, examination of the nude inmate's body, followed by a supervised shower.  With respect to place, these procedures occur in a shower room where privacy is minimal.

As for the manner in which the strip searches are conducted, both procedures take place in the presence of other inmates, which further contributes to the humiliating and degrading nature of the experience.  The searches are performed pursuant to a blanket policy without distinction between indictable and non-indictable offenders. Thus, a hypothetical priest or minister arrested for allegedly skimming the Sunday collection would be subjected to the same degrading procedure as a gang-member arrested on an allegation of drug charges.  Arguments extolling the virtue of administrative efficiency in a jail setting cannot overcome this unreasonable result.

The final prong of the <u>Bell</u> balancing test concerns the facility's justification for the policy.  Burlington County and Essex County both appeal to general security concerns.  (<u>See</u> Def. Burlington Br. at 7 & Def. Essex Br. at 27.)  While Essex attaches an expert report by George M. Camp of the Criminal Justice Institute calling for "admissions searches" for all incoming inmates, (<u>See</u> Def. Essex Ex. D.) (opining that "jails are more dangerous than prisons"), Burlington attaches reports on gang violence throughout New Jersey.  (<u>See</u> Def. Ex. C.)

Burlington makes the case that the search policy is not only necessary to prevent smuggling of contraband, but also to identify gang members through body markings, tattoos, and piercings.  (<u>See</u> Def. Burlington Br. at 8.)  They state, "[t]he simple fact is that if a correctional facility fails to identify members of rival gangs, and house rival members in the same cell, inmates and/or staff members will be injured or die."  (<u>Id.</u>) This statement references a 2004 New Jersey State Police Survey indicating statewide gang membership at 16,701 with 516 gangs.  (<u>See</u> Def. Burlington Br. at 8 n. 6.) Burlington also references an exhibit showcasing new statistics from a 2007 survey of

the New Jersey State Police.  According to that survey, just nine out of twenty-five

townships and boroughs in Burlington County reported zero gang presence.  (Def. Ex.

C.)  These statistics lend some weight to Burlington's argument, but they are not enough

to carry the day.  Surely a visual observation–which for purposes here is tantamount to a

strip search and therefore highly intrusive and degrading–is not the only method

available to jail officials to screen for potential gang members upon intake.  Moreover,

nothing in this Court's holding prohibits jail officials from ever searching non-indictable

offenders, assuming they have reasonable suspicion to do so.

Burlington also appeals to health concerns in its justification of the search policy.

(See Def. Burlington, Br. at 9.)  They state, "M.R.S.A.[19] is most commonly detected by

the presence of abscesses, cellulitis, boils, carbuncles, and impetigo, all of which could

be missed absent a visual inspection of the inmate's entire body."  Id.  Essex does not

make a similar health-related argument.

Pointedly, this Court fails to see how a private screening with a licensed medical

professional cannot sufficiently alleviate Burlington's concerns with respect to the

spread of M.R.S.A. or other staph infections.  The fact that Defendants provide no

affidavits certifying the presence of such health threats in their facility, other than citing

nationwide statistics provided by the "Kaiser [sic] Foundation" in 2007, is telling.[20]

---

[19]    M.R.S.A., methicillin-resistant staphylococcus, also known as staph infection, "is a strain of staph that is resistant to the broad spectrum antibiotics currently used to treat it." (Def.'s Burlington Br., p. 9.)  According to statistics from the Kaiser Foundation in 2007, out of 1.2 million hospital patients diagnosed with the infection, the rate of fatality was between four and ten percent.  (Id. at n. 7)

[20]    Defendants also rely on a case called Gerber v. City of Burlington, et. al, Civ. No. 95-3043.  Defendants contend that the district court there upheld a search procedure similar to the one here.  (Def. Br. p. 4.)  For whatever reason, however, an opinion in that case does not

(Def. Burlington Br. at 9 n. 7.)  While the threat of M.R.S.A. is undoubtedly serious, the specter of staph infection alone does not, <u>ipso</u> <u>facto</u>, trump Fourth Amendment protections in this case.

Finally, it is worth noting that neither county submits supporting affidavits that detail evidence of a smuggling problem specific to their respective facilities.  Although the Supreme Court opined that evidence of a smuggling problem is "of little import" to the analysis, <u>see</u> <u>Bell</u>, 441 U.S. at 559, it did not exclude the evidence from analysis altogether.  In sum, the search policies at issue fail the <u>Bell</u> balancing test.  Moreover, the overwhelming weight of authority still supports the conclusion that blanket strip searches of non-indictable offenders, performed without reasonable suspicion for drugs, weapons, or other contraband, is unconstitutional.  As a result, Plaintiff's motion for summary judgment on this issue is granted.  Defendant's cross-motion for summary judgment is denied.  The question that arises from this holding is the remedy.

<u>                              </u>*3. Preliminary Injunction*

Plaintiffs seek preliminary injunctive relief on behalf of the certified class against Defendants Burlington and Essex Counties. (Pl. Br. at 22.)  A preliminary injunction is appropriate when the party seeking such relief shows: (1) a reasonable probability of

_____

exist.  Plaintiffs' counsel certifies that the case resulted in "a summary order disposing of a defendant that resulted not on the merits but because opposition was never filed."  (Pl. Opp'n Br. p.2.)  Plaintiff subsequently contends that Defendants' reliance on the case is "patently false" and done in "bad faith".  Plaintiff asks for an Order of Contempt, along with reasonable expenses and attorney's fees "incurred as a result of their false filing", pursuant to Federal Rule of Civil Procedure 56 (g).  While Defendants' apparent reliance on a non-existent case is troublesome, this request must be denied.  Defendants' submitted affidavits, (<u>see</u> Aff. of Def. Counsel, <u>filed</u> September 25, 2008), coupled with the statements on the record during oral argument, (<u>see</u> Oral Arg. Tr. at 40:15-25, 41:1-17, Nov. 10, 2008), sufficiently show that Defendants' reliance was not done in bad faith.

success on the merits; (2) irreparable harm; (3) that the non-moving party will not suffer greater harm if the injunction is granted; and (4) public interest favors the granting of the injunction.  See Child Evangelism Fellowship of New Jersey v. Stafford Twp. Sch. Dist., 386 F.3d 514, 524 (3d Cir. 2004).  Only if all four factors favor injunctive relief will Defendant be enjoined from the alleged conduct.  See New Jersey Hosp. Ass'n. v. Waldman, 73 F.3d 509, 512 (3d Cir. 1995).

Here, Plaintiffs contend that there is a "strong probability" of success on the merits in this case.  Given the holding of this District, coupled with the holdings from eight Circuit Courts of Appeal, see supra, this contention is valid.  Irreparable harm, however, is another matter.  A party moving for injunctive relief has the burden of demonstrating irreparable harm.  Hohe v. Casey, 868 F.2d 69, 72 (3d Cir. 1989).  The oft-cited standard for irreparable harm is a "clear showing of immediate irreparable injury".  See Continental Group, Inc., v. Amoco Chemicals Corp., 614 F.2d 351 (3d. Cir. 1980).  Irreparable harm is met when "a plaintiff demonstrates a significant risk that he or she *will experience* harm that cannot be adequately compensated."  Adams v. Freedom Forge Corp., 204 F.3d 475, 484-485 (3d Cir. 2000) (emphasis added).

In DiLoreto v. Borough of Oaklyn, 744 F. Supp. 610 (D.N.J. 1990), this District denied injunctive relief for a plaintiff in a strip search context, where that plaintiff "failed to show any likelihood that she is likely to be subjected to strip searches in the future..."  Id. at 624 (citing City of L.A. v. Lyons, 461 U.S. 95 (1983)).  Here, too, Plaintiffs have failed to show any risk that they are likely to be subjected to strip searches in the future.  Even if a "§ 1983 plaintiff's allegation that he has suffered from unconstitutional practices may be sufficient to establish standing to sue for damages,

'[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief.' " Brown v. Fauver, 819 F.2d 395, 400 (3d Cir. 1987) (quoting O'Shea v. Littleton, 414 U.S. 488, 495 (1979)).  Because this likelihood has not been shown, Plaintiffs' motion for injunctive relief must be denied for lack of standing. Because Plaintiffs fail in this regard, the remaining factors of the test need not be addressed.

### 4. Eleventh Amendment Immunity

The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State or by Citizens or Subjects of any Foreign State."  U.S. CONST. amend XI.  This Amendment bars suits by private parties against a state, see Edelman v. Jordan, 415 U.S. 651, 663 (1974) (recognizing that a state or Congress may waive such immunity via statute), even when a state is charged with a § 1983 violation.  Quern v. Jordan, 440 U.S. 332, 345 (1979).

As for state entities other than the state itself, it is well settled that "counties, municipalities and political subdivisions are not protected by the Eleventh Amendment."  Febres v. Camden Bd. of Educ., 445 F.3d 227, 229 (3d Cir. 2006) (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977)).  Some entities may be entitled to immunity, however, if deemed an arm of the state.  Febres, 445 F.3d at 229.  The test to determine whether an entity is an arm of the state and therefore entitled to Eleventh Amendment immunity is three-fold: (1) whether payment of a judgment resulting from the suit would come from the state treasury, (2) the status of the entity under state law, and (3) the entity's degree of autonomy.  See Chisolm v.

McManimon, 275 F.3d 315, 323 (3d Cir. 2001) (citing Fitchik v. New Jersey Transit Rail Operations, Inc., 873 F.2d 655, 659 (3d Cir. 1989) (en banc)).  The Third Circuit has repeatedly held that the most important factor is whether the payment of a judgment would come from the state treasury.  Chisolm, supra, at 323 (citing Carter v. City of Phila., 181 F.3d 339, 348 (3d Cir. 1999)).  Significantly, because Eleventh Amendment immunity is an affirmative defense, the burden of proving applicability is on the party asserting it.  See Carter v. City of Philadelphia, 181 F.3d 339, 347 (3d Cir. 1999).

Defendants Board of Chosen Freeholders of Burlington County, Warden Cole in his official capacity, and Burlington Jail contend they are entitled to Eleventh Amendment immunity.  (Def. Br. at 11-12.)  Defendants rely on New Jersey case law that purports to recognize counties as arms of the state.  See, e.g., State v. Rush, 46 N.J. 399, 414 (1966) (noting that counties meet the costs of prosecutions and are considered subdivisions of the state); and Bergen County v. Port of N.Y. Auth., 32 N.J. 303, 312 (1960) ("[H]istorically the county was solely a subdivision of the State constituted to administer state power and authority.").  These decisions supply some evidence of the status of counties under New Jersey law, but they do not address the precise issue as to whether the Board of Chosen Freeholders, Warden Cole in his official capacity, and Burlington Jail are entitled to Eleventh Amendment immunity.  In fact, Defendants advance no argument as to the third prong of the Fitchik test other than the citations to these cases.

The first and most important factor in the Fitchik analysis is whether payment from a judgment will be satisfied by the state treasury.  If a judgment against any of the three Burlington Defendants is to be paid from the state treasury, then the state

essentially becomes a party in interest to the litigation.  See Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 101 (1984).  This fact–if true–cuts in favor of granting immunity to Defendants.  Yet, once again Defendants submit no evidence to show that liabilities from a potential judgment will be paid by the state treasury.  The record is silent.  Plaintiffs, on the other hand, underscore that Burlington County maintains ten million dollars in general liability insurance pursuant to Policy No. MDB 0266755. (Lask Certif. Ex. D, filed 9/22/2008).  The fact that a state entity is self-insured cuts against the finding of Eleventh Amendment immunity.  See Fitchik., 873 F.2d at 661 (3d Cir. 1989).  Defendants parry this argument in their reply brief, choosing instead to rely on a recent unpublished decision in this District that does not address the self-insured issue.  See Haddad v. Flynn, 2008 WL 4224921 (D.N.J. Sept. 9, 2008).  Given this response, the first and most important factor in the analysis does not favor the granting of immunity.

The Fitchik autonomy prong remains.  Defendants cite to N.J. ADMIN. CODE 10A:31-8.5 to demonstrate a lack of autonomy.  (Def.'s Burlington Br. at 13.) Defendants state that this regulation, promulgated by the State Department of Corrections ("DOC"), governs the conduct inside the Burlington Jail.  (Id.)  The inference is that each Burlington Defendant is duty-bound to adhere to the regulation. To be sure, DOC has authority "over all county and city jails or places of detention." (Id.)  But that does not complete the inquiry.  Another portion of Title 10 provides that "each [jail] facility shall develop and implement a comprehensive written plan governing searches of facilities and inmates."  N.J. ADMIN. CODE 10A:31-8.2(b).  This suggests a degree of autonomy whereby a jail facility, like Burlington, could implement its own

plan for intake procedures.  As Warden Cole in his official capacity represents the Jail, he too shares this degree of autonomy.  In fact, it appears both entities have fulfilled this task with noble intentions.  According to Section 1186, see supra, of the Policies and Procedures of the Burlington Jail, "[i]n the absence of reasonable suspicion or other permitting circumstances, inmates committed on non-indictable charges shall not be strip searched."  (Pl. Ex. L.)  Regardless of the fact that all inmates were subjected to what they called a "visual observation", this policy guide demonstrates the autonomy that Defendants Burlington Jail and Warden Cole enjoyed.

With respect to the Board of Chosen Freeholders, this governing body enjoys considerable autonomy consistent with the strong tradition of home rule in New Jersey. See N.J. STAT. ANN. 40:20-1.2 ("The grant of powers shall be construed as liberally as possible in regard to the county's right to reorganize its structure and to alter or abolish its agencies.").  For example, the Board of Chosen Freeholders is "empowered to make policy and management decisions", see N.J. STAT. ANN. 40:20-1.4, including the power to adopt its own "administrative code".  See N.J. STAT. ANN. 40:20-1.3(a).

These findings aside, Defendants' arguments and factual averments are too scant to support a finding of Eleventh Amendment immunity.  Defendants have not carried their burden.  As a result, this Court cannot support an application of Eleventh Amendment immunity to the Board of Chosen Freeholders, Warden Cole in his official capacity, or Burlington Jail.  Based on the present record before it, such a finding, if warranted, is premature.[21]  Defendants' claim is therefore denied without prejudice.

---

[21]     Defendants may wish to supplement the record and raise this issue at a later date.  See Blake v. Kline, 612 F.2d 718, 726 (3d Cir. 1979).

*5. Qualified Immunity*

The doctrine of qualified immunity provides that "government officials performing discretionary functions ... are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person should have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Thus, the threshold question must be: "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Saucier v. Katz, 533 U.S. 194, 201 (2001).  If a constitutional violation exists, then the next question must be whether that right was clearly established at the time of the violation.  Id.  The general touchstone is whether the conduct of the official was reasonable at the time it occurred.  See Brosseau v. Haugen, 543 U.S. 194, 198 (2004).  Finally, because qualified immunity is an affirmative defense, the burden of proving its applicability rests with the defendant.  See Beers-Capital v. Whetzel, 256 F.3d 120, 142, n.15 (3d Cir. 2001).

Here, Warden Cole in his individual capacity is not entitled to qualified immunity.  As discussed above, see Part III.B.2.iii of this Opinion, a constitutional violation is clearly present.  The "visual observations" of all incoming inmates charged with non-indictable offenses, performed without reasonable suspicion, violates the Fourth Amendment.  Even incoming inmates have the right to be free from unreasonable searches.

The next question, then, is whether the right violated by Warden Cole in his individual capacity was clearly established at the time the searches took place–i.e. from

March 3, 2003 to March 20, 2008.  This Court stated in its Opinion certifying class–

"<u>Davis</u> is an Opinion of this Court and is therefore the law within this district."  <u>Florence</u>,

<u>supra</u>, at *16.  In accordance with that statement, <u>Davis</u> has been the law within this

district for nearly twenty-two years.  <u>See</u> <u>generally</u> <u>Davis v. City of Camden</u>, 657 F. Supp.

396 (1987). Additional decisions by other  courts in this district have supported and

relied on that holding.  <u>See</u>, <u>e.g.</u>, <u>Diloreto v. Borough of Oaklyn</u>, 744 F. Supp. 610 (D.N.J.

1990); <u>Ernst v. Borough of Fort Lee</u>, 739 F. Supp. 220 (D.N.J. 1990); <u>O'Brien v. Borough</u>

<u>of Woodbury Heights</u>, 679 F. Supp. 429 (1988); <u>Roderique v. Kovac</u>, 1987 WL 17058

(D.N.J. September 14, 1987).  The fact that the Third Circuit has not ruled on the present

issue does not somehow lessen the binding effect of these judgments.  Therefore, some

level of suspicion has been required to strip search non-indictable or minor offenders

since 1987.  Given that Warden Cole has worked at the Burlington County Jail since

1976, serving as its Warden since 1997, it strains credulity that he was not aware of the

fact that the policy in place at Burlington Jail was unconstitutional.  Thus, "if the law

was clearly established, the immunity defense ordinarily should fail, since a reasonably

competent public official should know the law governing his conduct."  <u>Harlow v.</u>

<u>Fitzgerald</u>, 457 U.S. 800, 818 (1982).

Defendant nonetheless contends that the search policy was objectively reasonable

because it was implemented pursuant to a state regulation.  Specifically, Defendants

maintain that the searches were conducted pursuant to N.J. ADMIN. CODE. 10A:31-8.5.

That statute reads in relevant part:

(b) Strip Searches may be conducted in any of the following circumstances:

1. Prior to admitting a person lawfully confined to an adult county

correctional facility, prison or jail by court order or pursuant to an arrest authorized by law;

2. Before an inmate enters the facility after being permitted to leave for any reason;

3. Whenever there is reasonable suspicion that an inmate is carrying contraband;

4. Before placement of an inmate into:
    i.  Prehearing Detention;
    ii.  Disciplinary Detention;
    iii. Protective Custody.

5. Before placement of an inmate under a psychological observation or suicide watch;

6. Whenever the person admitted for a minor offense(s) is known to have a history of violent or assaultive conduct or a previous conviction(s) for a crime(s); and

7. After a contact visit.

Id. According to Defendant, the searches performed at the Burlington Jail were conducted pursuant to Section 1 of that Code. (Def. Burlington Br. at 14.) This section facially permits the strip searches of newly admitted persons, thereby lending support to Defendant's argument. Reading further though, Section (b)(3) permits strip searches when "reasonable suspicion" of contraband is present. Additionally, Section (b)(6) permits strip searches of persons admitted on the basis of "minor offenses" who have a criminal history. Recognizing that the broadly-phrased Section (b)(1) counter-intuitively swallows these sections of the statute, Sections (b)(3) and (b)(6) still call for individual discretion rather than the blanket policy implemented here. There mere fact that there is ambiguity or inconsistency in this regulation does not change the fact that the law on this issue was clearly established on this issue as of 1987.

43

Furthermore, there is great similarity between Section (b)(1) of the present Code, and the portion of the Code held unconstitutional in <u>Davis</u>.  <u>See</u> <u>Davis</u>, <u>supra</u>, at 398 n. 2 ("All newly admitted inmates shall be thoroughly searched.  Each newly admitted inmate shall be strip searched for weapons and contraband.") (quoting N.J. ADMIN. CODE 10A:31-3.12(2) (1979)).  Such similarity between these broadly phrased sections ought to have put Warden Cole on notice that the policy implemented at Burlington Jail was unconstitutional.

Defendant cites the recent case of, <u>Smart v. Taylor</u>, 2008 WL 755904 (D.N.J. March 19, 2008), to support his contention for qualified immunity.  In that case, the Court found a constitutional violation when the plaintiff was strip searched immediately before a court hearing, and then immediately after the same hearing.  <u>Id.</u> at *5.  Despite the violation, the Warden and the C.C.C.F. Officer who conducted the search were entitled to qualified immunity because the search was conducted pursuant N.J. ADMIN. CODE 10A:31-8.5.  <u>Id.</u> at *6.  The Court stated, "This regulation on its face does not appear to violate the Fourth Amendment."  <u>Id.</u>  Even though this is the same general regulation upon which Defendant in this case relies, the defendants in that case relied on a different section.  Moreover, the facts are inapposite to the present case.  As a result, Defendant finds no refuge in <u>Smart v. Taylor</u>.  Defendant Warden Cole is not entitled to qualified immunity.  The claim is denied.

### 6. Arrest Claim

Finally, Defendant Essex generally claims that "the arrest claim was invalid." (Def.'s Essex Br. at 35.)  Essex states that "the plaintiff has provided no evidence that there was a custom or policy of making improper arrests by the Essex County Sheriff's

Office or the County of Essex.  Without such factual contentions any claim against the County of Essex must be dismissed." (Id.)  Defendants do not cite a particular Federal Rule of Civil Procedure to advance this claim, although they style it as a motion to dismiss.  Thus, it is evident that Defendant seeks dismissal on Count 5 of Plaintiff's First Amendment Complaint.  There, Plaintiffs allege "§ 1983 Municipality Custom Violations." (Am. Compl., ¶¶80-88.)  Plaintiffs' Opposition Brief contains no response to this claim by Essex.

When analyzing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true Plaintiffs' factual allegations in the complaint. See Phillips v. County of Alleghany, 515 F.3d 224, 233 (3d Cir. 2008).  Any inferences from the factual allegations are considered in the light most favorable to the Plaintiff. Id.  It is not required that the plaintiff plead evidence.  See Bogosian v. Gulf Oil Corp., 561 F.2d 434, 446 (3d Cir. 1977).  The plaintiff is required, however, to plead "enough facts to state a claim that is plausible on its face." Bell Atlantic Corp.v. Twombly, 550 U.S. 544, ---, 127 S. Ct. 1955, 1974 (2007).

Here, the relevant allegations from Plaintiffs' First Amended Complaint state:

81.  Defendants Burlington County Jail, Burlington County Board of Chosen Freeholders, Essex County Correctional Facility and Essex County Sheriff's Department and Warden Juel Cole maintained a municipal policy or custom of detaining persons without promptly verifying if a proper warrant for arrest existed nor promptly doing anything to insure a person's liberty is not impeded by being falsely arrested.

82.  Those practices of the Defendants, who are government entities, are so permanent and well settled as to constitute a custom or usage with the force of law.

84.  Defendants had contemporaneous knowledge of the offending

> incident or knowledge of a prior pattern of similar incidents and circumstances.
>
> 85.  Defendants failed to train, discipline or control its personnel...
>
> 86.  Defendants actions or inactions communicates a message of approval to the offending subordinate Defendants John Does 1-8.
>
> 88.  Defendants failure to provide adequate training and supervision to its police officers and employees constitutes a willful and wanton indifference and deliberate disregard for human life and the rights of private citizens, including Plaintiff.

(Am. Compl. ¶¶ 81-88.)

Although Defendant is correct that Plaintiff has "provided no evidence" that it was the policy or custom of Essex to engage in the alleged wrongful conduct, evidence is not required at this time.  See Bogosian, 561 F.2d at 434.  Indeed, "complaints alleging municipal liability under § 1983" are not subject to heightened pleading standards.  See Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, et al., 507 U.S. 163, 168 (1983) (contrasting pleading requirements for allegations of municipal liability under § 1983 with that of "fraud or mistake").  The factual allegations cited above sufficiently comply with the pleading requirements of the Federal Rules.  See Fed. R. Civ. P. 8(a).  Therefore, Defendants' motion to dismiss is denied.  Plaintiffs have pleaded sufficient facts to advance their claim.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is granted, and Defendants' cross-motion for summary judgment is denied.  Plaintiffs' request for preliminary injunctive relief is denied.  Defendants Board of Chosen Freeholders of Burlington County, Warden Cole in his official capacity, and Burlington County Jail did

46

not sustain their burden on a claim for Eleventh Amendment immunity.  Therefore, this claim is denied without prejudice.  Warden Cole's claim for qualified immunity in his individual capacity is denied.  Finally, Defendant's motion to dismiss the arrest claim is denied.  Plaintiffs have pleaded sufficient facts to withstand Defendant's challenge.  It is so ordered.

/S/  Joseph H. Rodriguez<br/>U.S.D.J.

Dated: <u>February 4, 2009</u>